## Schaub v. The Hannibal & St. Joseph Railroad Company, *Appellant.*

### DIVISION TWO.

1.  **Railroad:** NEGLIGENCE OF FELLOW-SERVANT. A brakeman in the service of a railroad assumes the risk of injury caused by the negligence of the company's trainmen in leaving a freight car on a sidetrack so as to injure the brakeman while riding on a passing train.

2.  ———: SERVANT: VIOLATION OF RULES. A brakeman who is injured while violating a known rule of the company prohibiting him from going between cars in motion to uncouple them cannot recover of the company for such injury, in the absence of all evidence showing that the company knowingly permitted the violation of its rule.

3.  ———: ———. A servant cannot recover of the master for injuries received in consequence of his having left his place of duty and improperly engaged in the performance of the duties of another.

4.  **Personal Injury:** ASSESSMENT OF DAMAGES: INSTRUCTION. An instruction as to the measure of damages in a personal injury case is improper which does not state the elements of damages for which compensation is allowed.

Schaub v. The Hannibal & St. J. Ry. Co.

*Appeal from Hannibal Court of Common Pleas.*
HON. THOS. H. BACON, Judge.

REVERSED AND REMANDED.

THIS is an action for damages by respondent as widow of John J, Schaub, deceased, against the appellant, for the alleged negligent killing of said John J. in this, that on the ninth of November, 1887, said deceased was a brakeman on one of defendant's freight trains, and, in endeavoring to get off said train to uncouple some cars, he was struck by a car negligently left standing on a side or switch track of defendant so close that it was dangerous.

The answer was a general denial and a plea of contributory negligence; that the injury was caused solely by the negligence of said John Schaub in leaving his post on the top of defendant's car while it was in motion and entering the station at Palmyra, in violation of defendant's rules in force at the time and well known to said Schaub; and negligently placing himself on the side of said car while it was in motion.

Deceased was twenty-nine years, five months old at date of his death. He left a widow and two children. He had worked five or six months for defendant as brakeman on freight train on the division between Hannibal and Brookfield. No one saw the deceased when he began to fall from the car on which he was working. The crew to which he belonged consisted of Pratt as conductor; Graham, engineer; McKevin, fireman; and Alexander Howey and Schaub as brakemen. Howey was on the same car with deceased when he fell. He was a witness for plaintiff, and testified that on night of eighth of November, 1887, his crew left Brookfield with freight train number 13, for Hannibal. They arrived at Palmyra at about 4:30 in morning of ninth of November, 1887. They left the junction for Hannibal between five and six o'clock. Palmyra station is about one mile

from the junction.  At the junction they had orders to set some cars on sidetrack at Palmyra.  While going round the curve and approaching the station, Schaub and Howey were standing on top of the third or fourth car from the caboose.  The head or front cars were those that were to be set on sidetrack.

Howey says, " When we reached a point half way between the switch-bar at the north end of the switch track, and the station house, I turned to set the brake to stop the train to set out the cars.  While setting the brake I saw Schaub falling between the cars.  When I last saw him before that he was sitting on the side of the north end of the car.  At the side of this end was a ladder."  He didn't see him when he began falling.

The train was running at a rate of five or six miles an hour at the time.  There were three freight cars standing on the sidetrack.  "Can't tell the exact point at which they stood, but we were opposite them when I saw him falling.  I saw the three freight cars at the time.  Schaub fell on the side next to these cars.  We were on the straight track at the time."

Witness could not say whether Schaub was on the ladder or not, or whether he was struck by the cars. The sidetrack is some three hundred or four hundred yards in length and lies east of the main track, and between the main track and the station house, and is connected with main track by switches at both ends, north and south.  As soon as he saw Schaub fall he signaled to stop.  After the cars stopped, he went to Schaub and found him lying between the main and sidetracks about four feet south of the south end of the car standing on the sidetrack nearest the switch.  His leg was crushed.  This witness was asked by plaintiff what was the custom in regard to setting out cars.  He answered, " By pulling up and stopping, cutting them off and then go up and set them out."

He also testified that it was his (Howey's) duty to cut the cars and throw the switch and that it was Schaub's duty to stay on top of the car until it was stopped on sidetrack. He also testified that there was a rule of the company in force at that time strictly for-bidding the uncoupling of cars while in motion. He testified that every time card had a copy of the rules on it, and that he had seen Schaub with a copy of these rules.

Graham, the engineer, testified that, immediately after receiving the signal to stop, he did so and went back to where Schaub was lying between the tracks. Schaub there said to Graham, that "when *he went down on the ladder and went to swing himself around in between the cars to pull the pin, the car on the side-track brushed him off.* The accident occurred after five o'clock. It was a little bit foggy. We were using our lamps as it was not light enough to see the signals."

Krummell testified for plaintiff that for many years he had been hauling flour from one of the city mills to the depot for shipment; that he was thus engaged on the eighth and ninth of November, 1887. His last trip on the eighth was late in the evening of that day. He then saw some box freight cars, three he thought, stand-ing on the north end of the sidetrack at the station. When he made his trip the next morning November 9, about seven o'clock, the cars were still standing there on the sidetrack in the same position in which they were standing the evening before. That morning he heard of the accident to Schaub. The cars were standing about midway between the station house and the north end of the sidetrack. The distance from the north car to the switch was not quite six rails' length. Cars were fre-quently set in there. That was the place for them to stand while being loaded and unloaded. He had unloaded a great many at that place. They were fre-quently set further north than the place at which these three cars were standing.

Ray testified that he was at Palmyra on the occasion of the funeral of Schaub, a day or two after his death. As Schaub died on the eleventh he could not have been there before the twelfth or the thirteenth. On the day of the funeral he saw blood on the end of a main-track tie twenty feet south from the frog or point where the rails came together. He measured the distance from rail to rail between the two tracks at the point where he found the blood. It was seven feet, six inches. The curve of the sidetrack, that is the distance from the frog to the point where it becomes parallel with main track, is about two rails' length, about thirty-five or forty feet. A rail is thirty-two feet long. Freight cars are thirty-two to thirty-four feet long, and eight feet wide. They project over the rails from one and one-half to two feet. The sidetrack north of station house would hold six to seven cars and clear the switch.

A section foreman of defendant lived about two hundred yards from the north end of the sidetrack, and there was no obstruction between his house and the sidetrack. The sidetrack where the three cars stood on the morning of the accident was in view of the station agent's window. A diagram of the location was offered in evidence to the jury. It was shown to a witness and was proven to be a fair representation, though not perfect as to distances, etc. The court excluded it as evidence, but permitted counsel to use it as an exhibit in connection with other evidence.

Among other things, the defendant, on cross-examination of the plaintiff's witness, Howey, proved the following rules of the defendant were in force for the regulation of its employes managing its trains:

"Every employe is required to exercise the utmost caution to avoid injury to himself or to his fellows, especially in switching or other movement of the trains."

"Jumping on or off trains, or engines in motion, entering between cars in motion to couple them, and all similar imprudences are dangerous and in violation of

duty and are strictly prohibited; employes are warned that, if they commit them, it will be at their own peril and risk."

"Conductors of all freight trains in approaching and passing through all stations, whether the train stops or not, must know that both brakemen are on duty at their posts, and no employe is allowed to absent himself from his duty or assume any other position than the one to which he has been assigned, without special permission from his superior officer."

To use the language of the witness it was strictly forbidden to run switches and pull pins when the cars were in motion.

At the close of plaintiff's case defendant prayed the court to instruct the jury as follows: "The said defendant moves the court to instruct the jury that under the pleadings and evidence in this case the plaintiff cannot recover, and they will find their verdict for the defendant."

The court refused said instruction, and defendant at the time excepted.

The defendant declined to introduce any testimony. Thereupon the court, at the instance of the plaintiff, gave to the jury the following instruction: "If the jury believe from the evidence that John J. Schaub, deceased, was the husband of the plaintiff on and prior to the ninth day of November, 1887, and that the said John J. Schaub was, on and prior to the said ninth day of November, 1887, in the employ of defendant as brakeman on a freight train, and, in the line of his duty as such, and in and about the business of the defendant, under the control and direction of her agents, he received the injuries complained of on the ninth day of November, 1887, at Palmyra station, on the line of defendant's railroad, at Palmyra, Marion county, Missouri, and that said injuries directly caused the death of said John J. Schaub, on or about the eleventh day of November, 1887, and that the plaintiff herein

then became, and now is, his widow; and if the jury shall further find from the evidence, that at said Palmyra station on the early morning of said ninth day of November, 1887, and when it was yet dark, the said John J. Schaub was so working for the defendant in the careful and prudent discharge of his duties on a freight train as brakeman, and while engaged in setting some cars in on the south end of a sidetrack or switch track, and at the time he was standing on a ladder attached to the side of a freight car in said train, and, while said car and said train drawn by a locomotive engine was passing the north end of said sidetrack or switch track, the said John J. Schaub was violently struck and knocked off and thrown from said ladder so attached to said moving car, and under the wheels of said moving cars, by a freight car standing on the curve of the north end of said sidetrack or switch track, and then and thereby bruised, crushed, mangled and wounded, of which said injuries he died as aforesaid; and if the jury further find from the evidence, that the striking, knocking and throwing off of the said John J. Schaub from the ladder on said freight car, and under the wheels of said moving cars, and the wounds, injury and death of the said John J. Schaub was wholly caused by the negligence and carelessness of the defendant, its agents or servants in negligently and carelessly suffering and permitting and allowing said freight car so standing on the north end of said sidetrack or switch track to be, and remain, in such close and dangerous proximity to its main-line track as to negligently and carelessly obstruct the same; and if from the evidence the jury further find, that at the time of the alleged injury the said alleged obstruction had existed for a time sufficient to have enabled a person of ordinary care and prudence under all the circumstances, in charge of his own affairs and property, to have ascertained and removed said obstruction, and that the said John J. Schaub at the time of said alleged injury was exercising such care and

Schaub v. The Hannibal & St. J. Ry. Co.

prudence as would have been exercised in his own affairs under all the circumstances, and was not aware of said alleged obstruction, then the jury will find for the plaintiff in a sum not exceeding $5,000."

The court, of its own motion, in lieu of instructions asked by defendant, gave the following instructions: "1. In lieu of certain instructions asked by defendant, the court of its own motion instructs the jury that, if from the evidence they find that the alleged decedent, John J. Schaub, was not knocked or brushed off from his train by collision with a car standing on the curve of defendant's sidetrack, the jury will find for the defendant.

"2. In lieu of certain instructions asked by the defendant the court, of its own motion, instructs the jury that, although from the evidence they may find that the alleged decedent, John J. Schaub, was knocked or brushed from his train by a car standing on the curve of defendant's sidetrack so as to interfere with ordinary passage on defendant's main track; yet, if from the evidence they further find that such obstruction, if any, at the time of the alleged injury had not existed for a time sufficient to have enabled a person of ordinary care and prudence, under all the circumstances, in charge of his own affairs and property, to have ascertained and removed said obstruction, the jury will find for the defendant."

To the giving of each and every of the above three instructions defendant objected and excepted at the time.

The following instruction was asked by defendant, and given by the court: "5. The jury are instructed that, in entering defendant's service as a brakeman, the deceased assumed, and took, upon himself the risks ordinarily incident to that business, and among which was the risk of personal injury to himself from the negligence, mistakes or oversight of his fellow-servants or

performing their work, and in this case the danger in risk of injury to himself from the action of any of defendant's trainmen, in setting in the freight cars on the sidetrack at Palmyra station, was one of the risks incident to his employment, and which he so assumed, and for any negligence in doing such work, plaintiff cannot recover."

Defendant prayed, and the court refused, the following instructions: "1. The jury are instructed that, under the pleadings and evidence in this case, the plaintiff cannot recover, and the finding must be for the defendant.

"2. If the jury believe from the evidence that the deceased, John J. Schaub, voluntarily took a position on the side of a car, and attempted to swing around between the cars for the purpose of drawing the coupling pin, while the train was running at the rate of from five to six miles per hour, then such act was negligence on his part; and, if he was hurt by reason of taking such position, then there cannot be a recovery in this case, and the verdict must be for the defendant.

"3. The jury are instructed that if the rules and regulations of the defendant in force at the time Schaub was injured prohibited its employes from going between cars to uncouple them while the cars were in motion, and if they believed that such rule had been in force for several years prior to the time Schaub was hurt, and that such rule was attached to the several 'time cards' issued by the defendant to its employes from time to time, and that Schaub had such card before he was hurt, then, if he attempted to swing around between the cars for the purpose of uncoupling the cars while they were in motion, and was hurt while making such attempt, then plaintiff cannot recover in this case, and the verdict must be for the defendant.

"4. The jury are instructed, that if it appears from the plaintiff's testimony that the post of duty of the head brakeman Schaub, plaintiff's husband, when the

train was approaching and passing through Palmyra station was on top of the cars until the train stopped, and if the jury believe from the evidence, that he left the top of the car and took a position on the ladder on the side of the car, and attempted to swing himself around between the cars while the train was in motion, and that he, while so doing, was brushed or knocked off the car and injured, and that if he had remained at his post on top of the car he would not have been so hurt, then there can be no recovery by the plaintiff, and their verdict must be for the defendant."

. To the action of the court in refusing said instructions and to each and every of them defendant at the time excepted.

The jury returned the following verdict :

" We, the jury, find for the plaintiff, and assess her damages at the sum of $4,000.

" M. E. Huston,
" Foreman."

After moving for new trial and in arrest and both being overruled, the defendant appealed to this court.

*Spencer, Burnes & Mosman* and *W. M. Boulware* for appellant.

(1) The risk of injury from cars stationed on the track, as in this case, was one incident to the employment in which deceased was engaged, and was one of those assumed by him in entering upon and remaining in said employment. *Baylor v. Railroad,* 11 Vroom, 23 ; s. c., 29 Amer. Rep. 208 ; *Lovejoy v. Railroad,* 125 Mass. 79 ; s. c., 28 Amer. Rep. 206 ; *Ladd v. Railroad,* 119 Mass. 412 ; s. c., 20 Amer. Rep. 331 ; *Gibson v. Railroad,* 63 N. Y. 449 ; Patterson's Railroad Accidents, p. 302, sec. 285, and cases cited ; p. 344, sec. 316 ; *Clark v. Railroad,* 28 Minn. 128 ; *Hulette v. Railroad,* 67 Mo.239 ; *Devitt v. Railroad,* 50 Mo. 302; *Spiva v. Railroad,* 88 Mo. 73 ; *Renfro v. Railroad,* 86 Mo. 32 ; *Smith v. Railroad,* 69 Mo. 32 ; *Rains v. Railroad,* 71

Mo. 114. ( 2 ) The position of the cars was attributable to the action of the trainmen. The negligence, if any, was their negligence. They were in the same employment and department of service as deceased, and were his fellow-servants. And, further, the risk of injury from negligent performance of duty by other trainmen is one that falls within the circle of risks of employment assumed. *Wright v. Railroad*, 25 N. Y. 562; Amer. St. Rep. 10, 835, note; 1, 31, 33, note; Whittaker's Smith Negligence, 139, note. ( 3 ) In making the movement in which he was injured deceased was neither at his post of duty nor in the performance of any duty incumbent on him. His post was the top of the car until it was stopped. It was the duty of Howey, the rear brakeman, to uncouple the cars. If he had been at his post, it is clear that he would not have been injured. That this fact will defeat plaintiff's right of action is believed to be beyond question. *Barry v. Railroad*, 98 Mo. 70; *Abend v. Railroad*, 111 Ill. 203; *Sears v. Railroad*, 53 Ga. 630 ; Thompson's Negligence, 2, 1017, sec. 21. ( 4 ) Deceased was bound to obey the rule of the company forbidding the uncoupling of cars while in motion. Obedience to said rule was required both in the interest of the company, and for his own safety. In violation of the rule he attempted to uncouple the cars while in rapid motion, and this attempt was the direct and proximate cause of his injury. That this fact will defeat the right of action is clear. *Darracott v. Railroad*, 83 Va. 288; *Prather v. Railroad*, 80 Ga. 427; *Pilkinton v. Railroad*, 70 Tex. 226; *Cincinnati, etc., v. Long*, 118 Ind. 579; Thompson, Neg. 2, 1018, secs. 23, 24; *Lockwood v. Railroad*, 55 Wis. 50.

*Harrison & Mahan* for respondent.

( 1 ) It was the duty of appellant to keep its main-line track at Palmyra station free and unobstructed and in a safe condition for its servants while in the discharge of their duties. This long-established rule, founded in

both reason and justice, has often been affirmed in this state. *Hall v. Railroad*, 74 Mo. 298; *Lewis v. Railroad*, 59 Mo. 495; *Flynn v. Railroad*, 78 Mo. 208; *Porter v. Railroad*, 71 Mo. 66; *Field v. Railroad*, 82 Mo. 435; *Gibson v. Railroad*, 46 Mo. 163; *Wilson v. Railroad*, 15 Am. & Eng. R. R. Cases, 192; *Welch v. Railroad*, 4 Am. Rep. 593. (2) The conductor of the freight train, whose crew set the box car in on the curve of the sidetrack, had full control over that car; he had the power to direct and did direct where it should be placed. Such conductor is not a fellow-servant with the brakeman. As to the brakeman and the train, the conductor stands in the place of and represents the corporation. His negligence in standing the car on the curve of the sidetrack was the negligence of the appellant, and appellant must respond in damages for injury caused by such negligence. *Ross v. Railroad*, 112 U. S. 377; *Whalen v. Church*, 62 Mo. 326; *Stephens v. Railroad*, 96 Mo. 207; *Sullivan v. Railroad*, 97 Mo. 113; affirming *Ross v. Railroad*, *supra*, see *Smith v. Railroad*, 92 Mo. 369. (3) The deceased, John Schaub, had the right to presume that the main-line track was clear, and that appellant would not stand a car on the curve of the sidetrack. And he had the right to act on such presumption, unless he had notice to the contrary. *Parsons v. Railroad*, 94 Mo. 286; *Condon v. Railroad*, 78 Mo. 567; *Porter v. Railroad*, 71 Mo. 79; *Waldhier v. Railroad*, 87 Mo. 48; *Devlin v. Railroad*, 87 Mo. 549. (4) The law presumes that the deceased was at the time in the exercise of due care, and the burden to rebut this presumption rests upon appellant. *Flynn v. Railroad*, 78 Mo. 212; *Petty v. Railroad*, 88 Mo. 320; *Buesching v. Gaslight Co.*, 73 Mo. 233. (5) It is not incumbent upon the plaintiff to prove that deceased was in the exercise of ordinary care and prudence. Contributory negligence is to be pleaded and proven as a matter of defense. *Parsons v. Railroad*, 94 Mo. 294; *Huckshold v.*

*Railroad*, 90 Mo. 548; *Donovan v. Railroad*, 89 Mo. 147; *Harrison v. Railroad*, 74 Mo. 364; *Thompson v. Railroad*, 51 Mo. 190. (6) Negligence, under the evidence in this case, was clearly a question for the jury to determine, and the court did right in submitting it to the jury. *Tabler v. Railroad*, 93 Mo. 80; *Barry v. Railroad*, 98 Mo. 71; *Flynn v. Railroad*, 78 Mo. 211; *Petty v. Railroad*, 88 Mo. 315; *Wilkins v. Railroad*, 101 Mo. 106. (7) The instructions are fair and liberal and proper declarations of law. *Hall v. Railroad*, 74 Mo. 301; *Johnson v. Railroad*, 96 Mo. 348; *Dougherty v. Railroad*, 97 Mo. 655; *Whalen v. Railroad*, 60 Mo. 325; *Banks v. Railroad*, 40 Mo. App. 467; *Goins v. Railroad*, 37 Mo. App. 222; *Porter v. Railroad*, 71 Mo. 72; *Lewis v. Railroad*, 59 Mo. 501.

GANTT, P. J.—From the foregoing statement it is evident that plaintiff bases her right of recovery upon the duty of defendant to exercise reasonable care to furnish her husband suitable machinery and appliances to carry on the business for which it employed him, and in this instance to furnish a safe and unobstructed track. The negligence of which plaintiff complained was the leaving of the box cars on the switch or side-track so close that her husband was knocked off in passing them as he swung off to let himself down from the train at Palmyra to uncouple the cars.

Defendant on the other hand seeks to escape liability on several grounds:

*First*, it maintains that under the evidence, conceding deceased was struck by the cars as he was descending the ladder to uncouple the train, the risk of injury from these cars so stationed was incident to his employment, and was assumed by him in entering upon and remaining in the employment; that the position of these cars was attributable to the action of the trainmen; that they were in the same common employment and were his fellow-servants, and that the risk of injury

from negligent performance of duty on their part was within the risks of employment he assumed.

*Second.* That the position of the cars on the side-track was usual and such that the main line was entirely unobstructed, and such that the deceased, if he had been at his post of duty on top his car, would have been safe, and such that the movement of setting cars in on the sidetrack, if made in the customary manner or with reference to the rules of the company, would involve no danger from the stationary cars. That it was not the duty of the company to assume plaintiff's husband would leave his post of duty and violate the rules made for his protection.

It is conceived, that much of the apparent conflict in the different cases, on the liability of the master to his servant for the negligent acts of other servants, grows out of the failure to keep in view *those personal duties which the master himself owes to his servants,* as distinguished from those they owe each other. For failure or negligence in the discharge of these personal duties of the master resulting in injury, the master is liable whether he acts in person or by other servants. If he acts by servants in such cases, it makes no difference as to the grade of the servant. The servant is *identified* with the master. The master's duties are cast upon him and for his default the master is liable, and in these cases the doctrine of "fellow-servants" so called has no application whatever. In this class of duties, it has long been established, that a railroad company, as a master, owes it to its employes to keep its road and works and its track in such repair as to insure the safety of its servants, who are required to work, and be on its tracks, and it is bound to furnish safe and sufficient machinery and cars. This duty it cannot delegate to any servant, high or low, so as to escape liability. *Lewis, Adm'r, v. Railroad,* 59 Mo. 495 ; *Hall v. Railroad,* 74 Mo. 298 ; *Siela v. Railroad,* 82 Mo. 435.

But on the other hand this obligation of the master does not extend so far as to require of him that he should be responsible for the negligence of his servants, if of competent skill and experience, in *using or managing* the means and appliances placed in their hands in the course of their employment, if they are *neither defective or insufficient*, and the rule is this: " That the servant must be presumed in entering on his employment to take all the ordinary risks of it, including risks of accidents happening by the neglect, acts or omissions on the part of other persons engaged in the same undertaking." Pollock's Essay on Jurisprudence, pp. 127, 128, 131, 133.

As said in *Ross v. Railroad*, 112 U. S. 377–383: "The general doctrine as to the exemption of an employer from liability for injuries to a servant caused by the negligence of a fellow-servant is well settled. When several persons are thus employed there is necessarily incident to the service of each the risk that the others may fail in that care and vigilance which are essential to his safety." In undertaking the service, he *assumes that risk*, and if he should suffer he cannot recover from his employer. He is supposed to have taken it into consideration when he arranged for his compensation. "He cannot in reason complain if he suffers from a risk which he has voluntarily assumed, and for the assumption of which he is paid."

And, under these circumstances, says Wharton in his work on negligence, "it makes no difference in the application of the exception that the employe receiving the injury is inferior in grade to the one whose negligence caused the injury." In other words, "If the co-servant whose negligence caused the injury was at the time representing the master in doing the master's duty, the latter is liable; if, on the other hand, the co-servant was simply performing the work of a servant, in his character as such the master is not liable."

*Laughlin v. State*, 105 N. Y. 159; *Hussey v. Coger*, 112 N. Y. 614.

With these general principles before us, we ask, to the breach of which class of duties, is due the injury which befell the plaintiff's husband, the master's or servant's? There is no allegation or proof that there was any defect in the construction of defendant's tracks and switches at Palmyra. No suggestion of any defect in the cars in the train on which he was running. There must have been in the very nature of things a point of conjunction where the switch or sidetrack left the main track; there is no charge that the stationary cars were without brakes or other appliances to keep them in position when set out and left on the sidetrack; there is no allegation that the conductor or any other superior ordered or directed the deceased to attempt to uncouple the train just at this point opposite the stationary cars. What then caused the injury? It would seem taking all the evidence of plaintiff together, that the north car of the three stationary cars was left so close to the main track that, when plaintiff's husband threw himself out to go down the ladder, he was brushed off.

As before said, there is nothing in the way of negligence predicated on the construction of the tracks or their want of repair. Now as to whose duty it was to put these cars far enough on the sidetrack as to avoid all danger of collisions with passing trains, the record is unsatisfactory.

One witness, Ray, was asked, " Under whose direction is a car placed on a sidetrack? *A.* Well the agent has got something to do with it of course. The general man is the train dispatcher, I *suppose.*

" *Q.* Who is the one the agent instructs? *A.* The conductor.

" *Q.* And the conductor instructs the brakeman? *A.* Yes, sir."

All that can be gleaned from this amounts to nothing more than when a freight train arrives at a station,

and it is desirable to have cars set on a switch or side-track, the station agent notifies the conductor, and the conductor notifies the engineer and brakemen, and they set the cars out. In so doing, they are performing the work of agents for a common master.

Each engineer and brakeman is aware that upon the proper performance of his duty depends the safety of other engineers and trainmen on the same road, and, unquestionably, it is the duty of every engineer, conductor and brakeman as they come into a station to be on the lookout for open switches or loose cars. When they enter the service of a road this is one of the ordinary and obvious risks, and the court properly so declared the law in giving the fifth instruction asked by defendant. All the facts in the case show that some agent of the company had left some time during the previous evening three cars on this switch at the ordinary place for loading and unloading; this is the common every-day duty of the men who man the freight trains; they handle these cars; they do the switching at all ordinary stations. From the evidence it appears the tracks at the point twenty feet south of the frog, where Ray discovered the blood, were seven feet, six inches apart. Allowing for the cars projecting eighteen inches over either track, there would still remain a space of four feet, six inches. The stationary cars were objects of such size that they could readily be seen, and Howey says were seen. Krummell, the mill teamster, says they were standing at the usual place.

Although the court gave defendant's fifth instruction to the effect that the deceased assumed the risk of injury to himself from the negligence of his fellow-servants in setting these freight cars too close to the point of the switch, it gave plaintiff's instruction in which it told the jury that if Schaub was knocked from the car he was on while standing on the ladder, and injured "wholly by the negligence and carelessness of the defendant, *its agents or servants*, in negligently leaving

the car standing so close to the north end of the side-track as to be in a dangerous proximity to the main track, then plaintiff could recover." Now the court here has not distinguished between the duty of the defendant as master and the duty of the servants, as servants, to each other, It has not told the jury that if the master furnished a safe and properly constructed track, and employed competent servants, and furnished safe cars, that it had performed all the duty it owed deceased. The jury are told on the contrary, that if deceased lost his life, by the negligence of the defendant, *or its servants*, the defendant was liable.   By its terms it includes *all of defendant's servants*, and, in so doing, authorizes the jury to attribute the negligence of trainmen engaged in the same common employment with deceased to defendant, and in so doing it most clearly contradicts the other instruction in which the jury were told deceased assumed the risk of the negligence of his fellow-servants.   The instructions under the evidence were misleading.

There was no evidence of any negligence in the case of anyone, except the trainmen who put the cars on the switch, and for that negligence the company was not liable to the deceased.   He had assumed that risk, and agreed to look out for, and avoid, it when he entered upon his service as brakeman.   If the servants who do this work almost exclusively were under no obligation to save each other's lives, and could throw all the risks of their dangerous employment upon the companies who employ them, all these great enterprises which require and employ the services of a large number of men would be seriously retarded.   The rule itself is just.   It simply requires of each servant to use care in protecting his own life, and that of his fellow-workmen.

These three cars temporarily left on this sidetrack were not such an obstruction that the company would be presumed to know of.   The earliest period they

were shown to have been on the sidetrack was at a late hour, the evening before the accident. The accident occurred at daylight next morning. No evidence was given that any servant, whose duty it was to remove the cars, knew of their proximity to the frog, nor did their position indicate any immediate danger. It is not like the case of a telegraph pole or other permanent structures, placed too near the track. These cars were the very appliances that the deceased and his fellow-servants were handling every day, and under the evidence it seems they were to put other cars on this same track, just as they or other trainmen had put these cars there the day before.

Besides being misleading and contradictory, we think this instruction is bad in not requiring Schaub at all events to use care in discovering the proximity of the said cars.

II. The uncontradicted evidence in the case is that there was a rule of the company prohibiting employes from going between the cars to uncouple them while in motion, and this rule had been in force for at least three years, and deceased was shown to have had a copy of these rules. Indeed they were printed on all of the "time cards." In the absence of all evidence that defendant knowingly permitted a violation of this rule, it is clear that deceased was bound to observe it, and if he persisted in breaking it, and was hurt in so doing, he could not ask the defendant to make good to him the loss or injury his own recklessness had caused. The court committed manifest error in refusing defendant's third instruction. If the deceased violated said rule, he was guilty of contributory negligence, that will bar his recovery in this cause.

The fourth instruction asked by defendant should have been given. When the deceased swung himself off of the car, so far as the evidence discloses, he was neither at his post of duty nor in the performance of

any duty imposed on him. His post, according to plaintiff's own testimony, was on top of the car until it was stopped. It was Howey's duty to uncouple the cars. It is clear that, if deceased had remained at his post, he would not have lost his life. Deplorable as it is, we do not see upon what principle of justice his employer could be expected to be held liable for injuries caused by a positive violation of a rule made for his protection. Had the deceased observed the other rule forbidding him from trying to uncouple the cars while in motion, and waited till they stopped, the accident would have been averted.

As this case must be reversed, it is proper to state that the plaintiff's instruction is wholly insufficient as to the measure of damages. Of course in this case, there can be no exemplary damages; compensatory alone could under the evidence be recovered. The court should have, as indicated in *Parsons v. Railroad*, 94 Mo. 286, given the jury the elements that enter into the damages in this case. It should first exclude all idea of *solatium* for injured feelings and loss of companionship. The pecuniary value of the husband's life, taking into consideration his age, health, probable length of life, his capacity to earn wages, should be considered; in other words, it is the pecuniary interest alone which the wife has in her husband's life, that she may recover, and it is peculiarly the province of the court to give the jury the measure of damages, and their province to fix the amount under the guidance of the court.

For these errors the judgment is reversed, and the cause remanded for trial in accordance with these views. All the judges of this division concur.