## LASAGNA v. McCARTHY et al.

No. 6979.  Decided February 28, 1947.  (177 P. 2d 734.)

See 39 C. J. Master and Servant, sec. 1111; 35 Am. Jur. 714.

*Farnsworth & Van Cott,* of Salt Lake City, for appellants.

*David A. West, Willard Hanson* and *Stewart M. Hanson,* all of Salt Lake City, for respondent.

LATIMER, Justice.

Plaintiff, respondent in this appeal, brought suit against the defendants alleging that as a result of their negligence he suffered personal injuries. Recovery was sought under the Federal Employers' Liability Act, 45 U. S. C. A. § 51 et seq., and not otherwise. The jury returned a verdict in favor of the plaintiff, and defendants brought the case to this court for review. For convenience, the defendants will be referred to in this opinion as "The Denver & Rio Grande Western Railroad Company," the "D. & R. G.," or as "Appellants;" and the plaintiff as "the respondent."

The evidence, taken from the record, and most favorable to the respondent, is, in substance, as hereinafter stated:

At the time of his accident, respondent was a first-class carman, qualified both as a car inspector and as a car repairman, and had been in the employ of the D. & R. G. Railroad since he was 18 years old, or for a period of 17 years. The accident occurred at about 3:00 p. m. on July 25, 1944, on the premises of the U. S. Naval Supply Depot, Clearfield, Davis County, Utah. This property was under the exclusive control and jurisdiction of the United States Navy. The scene of the accident was the classification or switching yard composed of 12 parallel railroad tracks 13 feet apart plus a "run-around" track, all running north and south and connected at either end by means of switches to the main lines of the Union Pacific and the D. & R. G. Railroads. These two railroads, during the period in question, were delivering about an equal number of freight cars to the Naval Supply Depot, the total number delivered and taken away by appellants being estimated as one to four trains daily, and anywhere from 5 to 45 cars per train. Both railroads and the Navy maintained their own inspectors at the yard. From the time appellants started bringing trains into this yard, which was during June 1943, until respondent was injured, there had been three inspectors employed

by them: Kennedy, Roseberry, and the respondent. Both Kennedy and the respondent had been used only to relieve Roseberry.

Generally speaking, the duties of respondent, as Car Inspector for the appellants, were to inspect the cars of inbound D. & R. G. Trains as soon as they came in, to ascertain their condition and to classify them "A", "B", "C", or "Bad Order", and to make any minor repairs he was capable of making on the spot. Respondent testified that during the time he was employed at the depot, he and the other inspectors would go together and make a joint inspection. The first inspection was made at the time the cars were brought into the yard, and a subsequent inspection made before the cars were taken out. Normally, the cars to be taken out by the appellants were placed on tracks identified as No. 11 and No. 12; and those to be taken out by the Union Pacific R. R. on tracks identified as No. 9 and No. 10. Respondent had not been told this, but learned it in the course of his work. However, there were exceptions to this rule ,and according to respondent's testimony he had no knowledge as to the destination of the cars, since this was a military secret.

Respondent claimed it was the practice at this switching yard for the inspector to inspect all cars as to road-worthiness, regardless of which railroad ultimately took them out. Inasmuch as speed was essential in the movement of these war supplies, the above was found by the inspectors to be the quickest and most efficient way to get the work accomplished.

Respondent was first sent to the U. S. Naval Depot, at Clearfield, as an inspector, on the 13th day of March, 1944, and he worked there until April 17, 1944. When he was directed to go he was informed by agents of appellants he would relieve Roseberry, and to get in touch with a Union Pacific man and the Navy man working there, and ask them what to do.

When respondent arrived at the yard and met the inspectors he requested information as to what he should do,

and they took him along with them. He noticed in their inspection that no blue flag was used, and he inquired if a blue flag were used. He was told they didn't use them there; that it would not do any good, and that "we just look out for ourselves."

On July 20, 1944, respondent again went to the yard to work in the place of Roseberry, and likewise on July 25, the day he was injured. Respondent had been furnished with a copy of the rules of appellants requiring a blue flag to be displayed on any track a man was working on, and had also been furnished the Navy blue-book of safety rules, in which Rule No. 9 required the locking of the switch to any track a man was working on. He was familiar with both these rules, and more so with the D. & R. G. rule since he had used the blue flag on other occasions. However, at the Naval Supply Base, the respondent testified that he and the inspectors with whom he worked always used what is known as the "lookout" rule; that is, if one man went between or underneath the cars, the other man watched for the approach of trains or other cars.

When the particular accident happened, it was the first and only time respondent knew of, when the "lookout" rule was violated. Respondent had used a blue flag previously, while working at other locations for the D. & R. G., but had not been furnished a blue flag for work at the Navy yard. He never requested a flag, and never notified appellants that there were none available, nor did he notify them that he was not complying with the "blue flag" rule. The other two inspectors had been furnished with and used a blue flag. Roseberry quit using it, however, after the Navy switching crew had run over it twice within a week. From that time on, Roseberry locked the switches with the lock from his tool box. He had informed Mr. Carlson, appellants' car foreman, that the first blue flag had been wrecked. Appellants had not furnished respondent a lock to lock the switches.

On July 25, 1944, the day he was injured, respondent in company with Olsen, a Navy Inspector, was inspecting

cars. Respondent was slightly in the lead. Olsen called to him to come back and look at a welded coupler, and while they were both between the cars on Track No. 9 a Navy switching crew switched some cars onto that track. The impact of these cars against the string of cars being inspected caused respondent to be knocked down and run over. Respondent was permanently injured, losing one leg, and receiving very serious injuries to other parts of his body.

Appellants have specified 11 assignments of error. Ten of the assignments go to either the giving of instructions which appellants claim to be erroneous, or the failure to give certain instructions requested by the appellants. The 11th and principal assignment of error goes to the failure of the trial court to direct a verdict in favor of the appellants. As this must be resolved in favor of appellants, the other assignments of error are of no particular importance to this decision.

The arguments appellants present in support of their contention that the trial court committed prejudicial error in denying defendants' motion for a directed verdict can be grouped under three headings, namely: (1) Plaintiff was outside the scope of his employment; (2) Appellants were not negligent; and (3) Respondent's negligence was the sole proximate cause of his injuries.

Appellants have strenuously insisted, both in their brief and in their argument that respondent was outside the scope of his employment when injured. The facts and circumstances shown by the record indicate otherwise. However, it is not believed a discussion of this point is necessary to a proper solution of the case. Neither is it necessary to consider the third ground, as to whether respondent's negligence was the sole proximate cause of his injury, inasmuch as this court has decided and so holds that respondent failed to prove any negligent act or acts on the part of the defendent railroad which proximately contributed to his injury. Thus, a disposition of the other phases of the case is not deemed material.

We now treat the one controlling ground, namely, whether or not there is any reasonable basis in the record for concluding that there was negligence on the part of the appellants which caused the injury. Respondent claims there is, and if we break his contention into its respective parts, the only violations of duty by the railroad are claimed to be: (1) Failure to furnish respondent with a safe place to work; (2) Failure to furnish him with a blue flag for his protection; (3) Failure to furnish him with a lock; and (4) Failure to enforce rules promulgated for the safety of the employees.

Insofar as the first ground is concerned, it cannot be claimed that the physical condition of the classification and switching yard of the U. S. Naval Supply Station was such that it was not a safe place to work. The only physical hazards were those ordinarily present in a railroad switching yard. No claim is made that either latent or patent defects in the premises contributed to the accident. Respondent claims that it was unsafe because the practices adopted there made it so. This being so, the four grounds merge into one. That is, because safety rules were not enforced, or safety appliances furnished to the respondent, the place was thereby rendered unsafe.

That a master must promulgate and enforce reasonable rules and regulations for the safety of employees is conceded. Respondent cites the case of *Merrill et al.* v. *Oregon Short Line Railroad Co.*, 29 Utah 264, 81 P. 85, 110 Am. St. Rep. 695, as authority for this rule. While that case holds an employer is under the positive duty to promulgate and enforce reasonable rules and regulations for the safety of his servants, nevertheless it does not go so far as contended for by the respondent. The basis for holding the employer negligent is that if he delegates to an employee the right to see the rules are enforced, and the employee fails in this delegated duty, then the employee's negligence is imputed to the employer. Quoting from the *Merrill* case, supra, 29 Utah at pages 277, 278, 81 P. at page 87, 110 Am. St. Rep. 695:

"* * * For the care with respect to enforcing the rules is just as much a primary and nondelegable duty as is the one of promulgating

rules or of furnishing a safe place or appliance.

" 'An employer does not discharge his whole duty by merely framing and promulgating proper rules for the conduct of his business and the guidance and control of his servants. He is also under the obligation of enforcing the rules in so far as that result can be attained by exercising a reasonably careful supervision over his business and his servants. In other words, a master's duty does not end with prescribing rules calculated to secure the safety of his employes. It is equally binding on him honestly and faithfully to require their observance.' Labatt, Master & Serv. § 214.

"* * * If, instead of personally performing his obligations with respect to his primary and positive duties, the master engages another to do them for him, he is liable for the neglect of that other, which in such case is not the neglect of a fellow servant, no matter what his position as to other matters, but is the neglect of the master to do those things which it is the duty of the master to perform as such * * *."

The troublesome feature of the case at bar is that the only employee of appellants who knew that both the rules of the Navy yard and the rules of appellants were being violated was the respondent himself; and he made no disclosure of such fact to the appellants. Therefore, if appellants engaged any one to see that the rules were being enforced, the only one it could have been, under the facts of this case, was the respondent himself; and it would be most unreasonable to hold that in a suit by an employee, his own negligence is the negligence of his employer.

There can be no question as to the promulgation of safety rules in this case. The evidence is uncontradicted that both the appellants and the U. S. Navy did in fact promulgate and publish reasonable rules for the safety of their respective employees. The pertinent rule promulgated by appellants is found in their book of Safety Rules, which was admitted in evidence. On page 6, under the title Blue Signals it reads:

"26. A blue signal displayed at one or both ends of an engine car or train, or on engineman's side of engine, indicates that workmen are under or about it; when thus protected it must not be coupled to or moved. Each class of workmen will display the blue signals, and the same workmen are alone authorized to remove them. Other equipment

must not be placed on the same track so as to intercept the view of the blue signals, without first notifying the workmen. When emergency repair work is to be done under or about cars in a train and a blue signal is not available, the engineman and fireman will be notified, and protection must be given those engaged in making the repairs."

The applicable rule published and promulgated by the U. S. Navy is found in their Rules and Regulations, 1944, also admitted in evidence. On page 6, Rule No. 9, it states:

"The lead switch to track on which car men are working will be locked with special lock. Such tracks will be switched only after car inspector has given permission."

According to respondent, he was entirely familiar with these rules, and according to the uncontradicted evidence, he was not complying with either of them at the time of this accident. The procedure which he claims was adopted, and which he further claims was in use, was that two or more inspectors would work together, and one would watch while the other would go between or underneath the cars. Assuming that the "lookout" system was in use and assuming that it was not adequate for the protection of the workmen, it would still be incumbent upon the respondent to show that appellants had knowledge of the non-compliance with the "blue flag" rule or had waived or abrogated it.

Respondent attempted to prove a waiver or abandonment of the rule by showing that Roseberry did not use the blue flag during the latter part of his service; that respondent never used it; that for a period of about 13 months only two employees superior to respondent had been in the yards of the Naval Base; and, that they were uninformed and made no effort to learn anything about what was being done to protect the inspectors of appellants.

Some of the facts which indicate that appellants had not waived or abandoned the "blue flag" rule were the following: The evidence shows that before respondent was injured the other two inspectors of the D. & R. G. had blue flags so as to be able to comply with the rule; and that when the regular D. & R. G. inspector, Roseberry, quit using a blue flag he adopted the rule of locking the switch to the

track he was working on, without any notification to appellants. Furthermore, all the inspectors, Union Pacific, D. & R. G., and Navy, testified that a safety rule was in force and effect, and the evidence fairly indicates that the rules adopted were safer than the one promulgated by the appellants. In this connection, it must be borne in mind that the natural channel through which appellants could be expected to find out about the violation of the rule, or the adoption of a new rule, was through the agents who violated or participated in it. This is not the usual case of a railroad yard used by a great many employees, where the system used is open, notorious, and such that by the use of reasonable care the methods employed should have been observed by the appellants. It is instead a case where the only person observing the failure to comply with the rule is the person who himself violates the rule.

The three inspectors who operated in the Naval Base yards from the time appellants first started running their trains into the yard were Roseberry, Kennedy, and the respondent. Kennedy testified he used the blue flag at all times during the brief periods totalling only 20 days that he worked there as relief man for Roseberry. Roseberry was the appellants' regular inspector at this yard, and he used the blue flag to begin with, until it was run over twice by Navy switching crews. Then he adopted what he believed to be the safer rule of locking the switch to the track he was working on. Respondent seems to be the only inspector who adopted the two-man or "lookout" rule. However, his injury on the day in question was brought about by his own violation of the very rule adopted by him. According to his best recollection, that was the only time he ever went between or underneath the cars without a lookout being maintained for his protection.

It does not appear that respondent was injured because any one safety rule had been abandoned. It appears instead that he was injured because he violated that rule which he claims to have adopted. If a master is chargeable with knowledge of a rule violated because his servant knows of

the violation, then if the servant adopts a rule that is safe or safer than the one promulgated by the master, certainly the benefit of this information is available to the master. It cannot be said that if a servant changes a system for one that is better, that the master has notice of the change but does not have notice of the improvement. For example, in the case of Roseberry, if the appellants were chargeable with knowledge that he had abandoned the blue flag rule, then they were chargeable with knowledge that the Navy rule of locking the switch had been adopted by him.

The fact that respondent was injured does not establish the fact that the rule adopted was not safe. Had the "lookout" rule been complied with when respondent went between the cars, according to his own testimony the accident would not have happened.

Entirely apart from the foregoing, respondent's facts do not establish a waiver of any rule by the appellants. When a reasonable rule has been published and has been called to the attention of an employee, the rule is binding upon him unless the master has sanctioned its repeated violation. The general rule as to this is set forth by Labatt, in his Master and Servant, par. 1138, page 3005, as follows:

"A principle established by a large number of decisions is that a rule ceases to be binding upon employees, where the master has sanctioned its repeated violation for a length of time sufficient to warrant them in acting upon the assumption that it was abrogated * * *."

At page 3008:

"An analysis of the principle above explained shows that, to enable a servant to take advantage of it, three evidential elements must be established.

"In the first place, the servant must show that there had been violations of the rule, so frequent that they might properly be described as habitual. * * *

"In the second place, the servant must show that these habitual violations were known to the master himself, or the employee whose duty it was to enforce the rule. * * *

"Lastly, the servant must show that the master, being thus aware of the violations of the rule, took no steps to secure its enforcement. * * *"

The Supreme Court of this state, in the early case of *Konold* v. *Rio Grande W. Ry. Co.*, 1900, 21 Utah 379, 60 P. 1021, 81 Am. St. Rep. 693, passed on the elements necessary to establish waiver of rules by the master and that portion of the decision found, 21 Utah on page 392, 60 P. on page 1023, 81 Am. St. Rep. 693, is cited as authority for the proposition that violations by the agent injured do not meet the required test:

"There is no evidence tending to show that the company expressly authorized any infractions of its rules or regulations, or that its officers had actual knowledge of any violation of the same, except in the one instance hereinafter mentioned. Therefore, if the rules and regulations of the company were ever abrogated, it must have been done by the habitual disregard of the same in such a manner and for such a length of time as to raise the presumption before mentioned * * *."

In the case of *St. Louis Southwestern Ry Co.* v. *Martin,* 165 Ark. 30, 262 S. W. 982, decided by the Supreme Court of Arkansas, the United States Supreme Court refused to review a suit wherein the plaintiff claimed relief under the Federal Employers' Liability Act. The Arkansas court's holding on the waiver of a safety rule is clearly indicated by the following excerpt taken from par. 7, 262 S. W. at page 985:

"* * * Habitual violation of a rule does not constitute an abrogation unless it is done so openly and continues for a long enough period to raise the presumption that the employer or those appointed by him to enforce the rule consented to the abrogation or knowingly acquiesced in it."

The U. S. Circuit Court of Appeals, 2nd Circuit, in the case of *Unadilla Valley Ry. Co.* v. *Dibble,* 31 F. 2d 239, concerning which a writ of certiorari was later denied by the U. S. Supreme Court, held that an employee could not recover on the theory that the safety rule had been abandoned

by the company when no officer or agent of the company, other than those violating the rule was shown to have known or had reason to know of the disregard thereof. Quoting from 31 F. 2d at page 240:

> "The only evidence that the rule had become a dead letter was that on certain other occasions, Dawson, the station agent, whose business it was to give a copy to both the conductor and motorman of any order that the south-bound train should pass the north-bound freight below Bridgewater, neglected his duty. Dawson according to this testimony, initiated the violation of the rule by handing both copies of such orders to the conductor. Certainly some agent representing the railway, other than the one violating the rule, should have actual or constructive notice of its disregard, before the company can be charged with abandoning its written regulations made for the protection of employes and passengers  *  *  *."

From the foregoing authorities it is apparent that the facts of the case at bar do not establish a waiver of the "blue flag" rule. To hold the appellants liable on the ground of failing to enforce rules, the respondent must have established either that the appellants had actual knowledge of the violations, or that there had been repeated and consistent violations such as would charge them with constructive notice thereof. Tested by these rules, appellants did not have constructive notice, as there had not been any such disregard of the "blue flag" rule as would raise a presumption that the rule had been waived by the company. Accordingly, respondent's contention for a waiver of the "blue flag" rule totally fails.

That the appellants had no actual notice must be conceded. The only evidence in the record with respect to any claimed notice is a statement by Roseberry to appellants' general car foreman that his blue flag had been wrecked and that he needed another. This, rather than being notice that the blue flag was not being used, would be notice that the rule was being complied with.

It is suggested that by ignoring the "blue flag" rule the Naval Authorities made the yard a more dangerous place to work than it would have been under such rule, and that

therefore the appellants had failed in their duty to furnish respondent a safe place in which to work. ██ Even granting that the place was rendered unsafe by this violation of the "blue flag" rule, the respondent himself had a better opportunity than the appellants to know of the increased danger. He controlled the means by which the place could be made safe, and his own failure to properly perform his work was the only reason the place was rendered unsafe.

The case of *Hardy* v. *Shedden Co., Ltd.*, 78 F. 610, on page 612, 37 L. R. A. 33, U. S. Circuit Court of Appeals, 6th Circuit, states the rule as to when the injured employee himself has a better opportunity than the employer to observe the increased danger:

"* * * But where, in the course of the employment, the acts of third persons, not employed by the master, may increase the danger of the service, and these acts and their character are under the eye of the servant, and, to the servant's knowledge, are not under the supervision of the master, we do not think the master is liable if injury results to the servant from the negligence of the third persons * * *. Where the servant has greater opportunity than the master to know and observe the probable results from the acts of the third person, of which the master, to the knowledge of the servant, has had no opportunity to judge, then it is unreasonable to hold that, with respect to such acts, the master has any obligation to the servant * * *."

In the case of *Yoakum* v. *Lusk et al.*, Mo. Sup., 223 S. W. 53, the Supreme Court of Missouri passed on a suit where a similar "blue flag" rule was promulgated by the railroad, and where the employee failed to observe it. The reasons set forth on page 56 of the decision fairly cover the respondent's position in the present case:

"But, if the master does promulgate rules, which, if observed by the servants, will protect them from injury, he has performed his full duty, and cannot be held for negligence, and is not liable for damages to a servant occasioned by the nonobservance of the rules by such servant. In *Francis* v. [*Kansas City, St. J. & C. B.*] *Railway Co.*, 110 Mo. [387,] loc. cit. 395, 19 S. W. [1935], 936 Macfarlane, J., has well said:

" 'It would be most unreasonable and unjust, after imposing upon the master the duty of promulgating a rule for securing the safety of his servants, to permit the servant to recover from the master damages for injuries which the observance of the rule would have prevented. As the master is bound at his peril to make the rules, the servant should be equally bound at his peril to obey them. In such case the disaster is brought upon the servant by his own voluntary act, and he, and not the master, who had discharged his duty, should bear the consequences. So it has been uniformly ruled. *Schaub* v. [*Hannibal & St. J.*] *Railroad*, 106 Mo. 74, [16 S. W. 724]; *Alcorn* v. [*Chicago & A.*] *Railroad*, 108 Mo. 81, [18 S. W. 188]; [*Memphis & C.*] *Railroad* v. *Thomas*, 51 Miss. [637,] 641; *Shanny* v. *Androscoggin Mills*, 66 Me. [420,] 429; *Lockwood* v. [*Chicago & N. W.*] *Railroad*, 55 Wis. 50, [12 N. W. 401, 327 Ill. App. 645]; *Zumwalt* v. [*Chicago & A.*] *Railroad*, 35 Mo. App. [661] 667; *Lyon* v. [*Detroit, L. & L. M.*] *Railroad*, 31 Mich. 429'."

In the case of *Porter* v. *Terminal R. Ass'n of St. Louis*, 327 Ill. App. 645, 65 N. E. 2d 31, cited by the appellants in support of the rule requiring the master to furnish the servant with a safe place to work, the Supreme Court of Illinois qualified the general rule with the following restriction, (quoting from par. 5, page 34) :

"So in the instant case, defendant sent plaintiff to the place where he was injured, in the performance of the duties assigned to him. He had no control of the instrumentalities at the place where he was so injured * * *."

A recent case in point is that of *McGivern* v. *Northern Pac. Ry. Co.*, 132 F. 2d 213, at page 217, wherein the 8th Circuit Court of Appeals stated the rule in these words:

"* * * The duty of providing a reasonably safe place in which to work and reasonably safe appliances with which to work while a continuing one does not obligate the employer to keep the place of work safe at every moment where such safety may depend on the due performances of work by the servant and his fellow workmen. *Kreigh* v. *Westinghouse C., K. & Co.*, 214 U. S. 249, 29 S. Ct. 619, 53 L. Ed. 984. In fact the rule is held not to be applicable where the workmen in the progress of their work render the place unsafe. *Torgerson* v. *Minneapolis, St. P. & S.* [*S.*] *M. Ry. Co.*, 49 N. D. 1096, 194 N. W. 741; *Cartwright* v. *Atchison, T. & S. F. Ry. Co.*, 8 Cir., 228 F. 872. Temporary conditions created by employees using or failing to use appliances furnished by the employer are not defects for which the employer may be held responsible in damages * * *."

For additional authority on this point, see *Morgan Construction Co. v. Frank,* 6 Cir., 158 F. 964; and *Medina Valley Irrigation Co. v. Espino,* 5 Cir., 214 F. 732.

The final question to dispose of is respondent's claim that he was told to take his orders from the inspectors on the job (who were not employees of the D. & R. G.) and that they told him, in effect, to disregard the "blue flag" rule. If by any stretch of the imagination it could be said that those from whom respondent received his instructions were authorized agents of appellants to modify or change the safety rules and regulations, then respondent is confronted with the fact that he should have complied with the "lookout" rule. If the statement made by agents of third parties that "we don't use the blue flag; we look out for ourselves" could be treated as binding on appellants, then, by eliminating the "blue flag" rule it adopted the "lookout" rule. This, according to his own testimony, respondent was violating for the first time at the moment he was injured. Two inspectors who worked regularly in this yard testified that the "lookout" rule was safer than the "blue flag" rule, and no one chose to disagree with them.

Aside from this, it seems unreasonable to decide that express rules and regulations published for the safety of respondent and under which he had been operating for many years, could be done away with by one employee, even though superior to respondent, by merely saying

"there is a U. P. man and a Navy man working there. Ask them what there is to do."

Clearly, such a statement does not permit the respondent to take orders from others contrary to long established customs of his employers, and to disregard those safety rules he knew appellants had been enforcing for many years. He certainly was not led to believe that the company had released all control of him, and that he was subject only to supervision, control, and direction of the employees of some third party. If respondent was given instructions by an agent of a third person to disregard those rules he well

knew had been promulgated for his own safety, and the new instructions rendered his employment more hazardous, or made the locale an unsafe place to work, then there was some obligation on his part to notify appellants. He cannot remain silent, fail to notify his employer, and then complain that they should have known he was working under unsafe conditions.

This is not the situation where the employee did not know or appreciate the danger. Respondent had worked for the appellants for 17 years, and was well acquainted with the dangers incident to his work. In addition, he had the capacity to know whether or not a new rule if adopted, was a more dangerous practice than the one promulgated by the appellants. Appellants were not obligated to know that respondent had adopted a different rule, and he was the only one through which they could be held to have acquired constructive notice. It would be strange, indeed, to hold that the master was liable because the servant had himself violated a rule, and that therefore the master had waived it. Particularly when the time and opportunity for appellants to observe and be charged with knowledge were as limited as in this case.

As Mr. Justice Douglas of the Supreme Court of the United States said in the latest pronouncement on this subject, in the case of *Ellis* v. *Union Pacific Ry. Co.*, 67 S. Ct. 598, 600, speaking of the Federal Employers Liability Act,

"The Act does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur. And that negligence must be 'in whole or in part' the cause of the injury."

Negligence of the employer being the basis for recovery under the Federal Employers' Liability Act, it is well to return to the ordinary definition of the term, which is

"the omission to do something which a reasonable person, guided by those considerations which ordinarily regulate the conduct of human affairs, would do: or the doing of something which a prudent person under like circumstances would not do."

Viewing the appellants' conduct in the light of this rule, we are unable to find anything in this record which in any way indicates that they omitted to do that which they should have done; or that they did that which they ought not to have done.

The judgment is reversed with direction to enter judgment for appellants. Costs to appellants.

McDONOUGH, C. J., and PRATT, WADE, and WOLFE, JJ., concur.