YONGUE, Respondent, v. ST. LOUIS & SAN FRAN-
CISCO RAILROAD COMPANY, Appellant.·

St. Louis Court of Appeals, June 23, 1908.

1. MASTER AND· SERVANT: Safe Appliances:   Negligence:
   Jury Question.   Where an employee of a railroad company at-
   tempted to take two loaded freight cars down a long grade
   where they would run too rapidly unless held by the operator
   with the brakes, and it was shown that the track was out of
   repair so that the cars would oscillate back and forth when
   running rapidly, that the brakes on the two cars were out of
   order so it was difficult to handle them, and the employee was
   afterwards found. dead on the track with blood on the ends of
   the ties for some distance near where he was lying and where
   stave bolts with which the cars were loaded were found scat-
   tered along the °route for a distance of a mile, showing that
   they had been thrown off by the oscillation of the cars in rapid
   motion, this was sufficient evidence to submit to the jury the
   question of whether the negligence of· the railroad company in
   failing to have proper appliances caused the deceased to fall
   from the car and his consequent death.

2. ———: Assumption of Risk.   The employer must use ordi-
   nary care to furnish his employees reasonably safe appliances
   with which to work and the employee only assumes such risks
   as are incident to his job after his employer has fulfilled the
   primary duty of using care to furnish proper working places
   and appliances.

3. ———: ———: Contributory Negligence.   Where a conduc-
   tor on coming to a station ordered a brakeman· to handle some
   freight cars which were to be shunted down a long grade and
   attached to his train, and the brakeman refused to take charge
   of them, an emergency arose which justified the conductor in
   getting on the cars and operating the brakes himself down the
   grade.   In so doing the conductor was not guilty of contribu-
   tory negligence, as a matter of law nor did he assume the risk
   incident to doing such work when the cars and track were out
   of repair and dangerous.

4. ———: Safe Appliances: Violation of Rules.   It is the duty
   of an employer conducting a complicated business to promul-
   gate rules to protect employees, and it is the duty of employees
   to obey such rules; disobedience of a rule by an employee re-
   sulting proximately in injury to him constitutes contributory
   negligence and is a defense to his action for damages.

5. ———: ———: ———: **Duty to Inspect.** Railroad companies have car inspectors whose duty it is to know cars are in good order and conductors and other employees who are enjoined by the rules of the company to inspect cars before taking them out, are bound to inspect, but in such inspection they could not substitute their judgment for that of the regular inspector. A conductor whose duty it was to inspect cars before taking them out, on being ordered to take two loaded freight cars from a station, was killed in handling them by reason of defective brakes, was not as a matter of law guilty of contributory negligence in his inspection of them in failing to know that the brakes were out of order and that the cars were dangerous to handle, the circumstances being such that a man of ordinary prudence might not have refused to handle them.

Appeal from Stoddard Circuit Court.—*Hon. Jas. L. Fort*, Judge.

AFFIRMED.

*W. F. Evans* and *James Orchard* for appellant.

(1) The evidence of plaintiff shows that the deceased had been working for the company quite a while and was on this road for ten days and knew the condition of the road of which plaintiff makes complaint, and no complaint, so far as the testimony shows, was ever made to the defendant in this case, but the deceased went on working for the company, and, of course, by reason of that and by his own acts, must be held to have assumed the risks of the condition, and that as a result of his silence in not making complaint to the defendant, the plaintiff is precluded both upon the grounds of assumption of risk and estoppel from making complaint. Watson v. Coal Co., 52 Mo. App. 370; Marshall v. Hay Press Co., 69 Mo. App. 260; Kleine v. Clothing Co., 91 Mo. App. 102; Cothron v. Packing Co., 98 Mo. App. 343; Beckman v. Brewing Assn., 98 Mo. App. 555; Bohn v. Railroad, 106 Mo. 429; Winhler v. Box Co., 137 Mo. 394. (2) It was shown by the plaintiff that the deceased went down to the cars before they were taken out of the switch and got on the cars. It was his duty at that time

to inspect the brakes and see whether they were in proper condition or not. And it follows from the above, that since the deceased's means of information was equal to, or greater, than those of his employer, the employer will not be held liable. Stagg v. Tea & Spice Co., 169 Mo. 499; Howard v. Railroad, 173 Mo. 529. (3) One of the contentions is that the master in this case the defendant, was conducting its business in the usual and ordinary way, and it is well settled in this State that the master may conduct his business in his own way and select his own machinery and appliances. Bernning v. Medart, 56 Mo. App. 443; Blanton v. Dold, 109 Mo. 64; Fiel v. Railway, 115 Mo. 503; Bradley v. Railway, 138 Mo. 293. (4) An employee cannot recover damages of his employer received in consequence of the violation by the employee of a reasonable regulation intended to promote his safety. Zumwalt v. Railroad, 35 Mo. App. 661; Schaub v. Railroad, 106 Mo. 74; Francis v. Railroad, 110 Mo. 387.

*Wilson Cramer* for respondent.

(1) It is the duty of the master not only to use reasonable and ordinary care to furnish his servant reasonably safe appliances in the first instance, but to use equal diligence to keep them so. Gutridge v. Railroad, 105 Mo. 529; Nichols v. Plate Glass Co., 126 Mo. 64. (2) The duty of inspection and repair is a continuous one, personal to the master, which he can not shift to the servant so as to shield himself from liability. Bartley v. Trorlicht, 49 Mo. App. 230; Krampe v. Brewing Assn., 59 Mo. App. 281; Settle v. Railroad, 127 Mo. 343; Rodney v. Railroad, 127 Mo. 689.

GOODE, J.—This plaintiff declares on sections 2865 and 2866, Revised Statutes 1899, for damages for the death of her husband alleged to have been caused by defendant's negligence. Deceased was the conductor of

a train which ran on defendant's railway between the towns of Brownwood and Bloomfield. He was killed on the evening of October 24, 1904, while engaged in the performance of his duties. The train was a mixed one, hauling both freight and passengers. When it reached the station of Zadoc early in the evening, deceased found standing on a spur or side track, two flat cars loaded with stave bolts which were to be taken to Bloomfield, the terminus of the line south of Zadoc whither the train was going. There had been brought to Zadoc by the train two cars which were to be set out on the side track, and in order to do this and take up the two loaded with stave bolts, it was necessary, in the first place, to move the latter cars from the spur and shunt them on the main line to the south, after which the cars intended to be left at Zadoc could be put on the switch. The grade of the road descends from said station to the south for about a mile, the fall in that distance being sixty feet. When cars were to be shunted ahead of the train, as the two in question were, it was the practice to allow them to roll to the foot of this grade, with their speed under the control of brakes, so as to prevent them from running away. They would be picked up when the train moved south. A trainman would go along with the cars and set the brakes to keep their speed in bounds. Two ranks of stave bolts were piled on the two cars in question to the height of six feet. These bolts were fifty-two inches long and made of oak timber and quite heavy. They were not fastened, but were held in place by standards on the sides of the cars near the ends. The north one of the two cars was much larger than the south one, their respective capacities being eighty thousand and forty thousand pounds. At the conclusion of the evidence an order to the jury to return a verdict in defendant's favor was requested and refused. Under the instructions given and the evidence submitted, a verdict was returned for plaintiff for $4,000. No exceptions

were saved to the instructions given; and though exceptions were saved to the refusal of some requested by defendant, the assignments of error in the brief do not call in question the rulings on specific instructions, but relate to supposed errors in the admission of testimony and to several propositions of law relied on in support of the contention that a verdict for defendant should have been directed. These propositions are lack of evidence to prove defendant's negligence was the cause of the death of the deceased, and, indeed, of any proof about how he came to his death, and that he was shown to have been guilty of negligence contributing to the casualty and to have assumed the risk of injury from the defects of the roadbed and the brakes on the two cars, said in the petition to have been negligently permitted by defendant, and constituting the gravamen of the cause of action. The case laid was that defendant had suffered its railroad to be in an unsafe and dangerous condition from a lack of ballast and from some of the ties under the rails being so rotten the rails were without sufficient support; which faults caused cars passing over the road to swing violently from side to side as the rails yielded. Negligence was also alleged in requiring the deceased to handle the two cars when the brakes on them were so out of repair they would not hold when set. In consequence of these defects in the railroad and cars, it is charged plaintiff's husband was jostled or thrown to the ground and sustained injuries from which he died in a few hours.

1. We will first notice the facts in proof relied on to establish the negligence of defendant and that it was the proximate cause of the death of the deceased. Just south of Zadoc the railroad ran through a cut six hundred feet long and eight feet deep, then over a fill about

four hundred feet long and seven and a half feet high, and a little further south, over a trestle one hundred feet long and fourteen and a half feet high. The track curved rather sharply to the east a short distance below the station and had a grade of about sixty feet to the mile. There were rotted ties in the roadbed which would break in two occasionally as trains ran over them, and the track was so uneven as to cause trains running at ordinary speed to rock from right to left with sufficient oscillation to set the engine bell ringing. The brake on the larger of the two cars which were loaded with staves, to be taken into the train at Zadoc, was situate at the center of the north end of the car, and the brake on the smaller, or south car, was at the north-east corner—the right-hand corner of the north end. Hence the brakes of the two cars were not immediately opposite each other. The rod of the brake on the larger car had been bent and, moreover, staves were piled about the rod, and in consequence of these facts the wheel whereby the brake was wound up would only revolve half-way around and it could not be set tight. The ratchet of the brake on the smaller car was broken off. This ratchet was arranged to catch in notches in a small stationary wheel around the brake rod on the floor of the car, so as to prevent the chain from flying loose after it was wound up. As the ratchet was gone, the only method of controlling the speed of the car was to hold the brake in place by main strength after it had been set; and the evidence tends to prove it was possible to do this. The foregoing description of the condition of the railroad and brakes agrees with the testimony for plaintiff. That for defendant inclines to prove the track was in fair condition for the quantity of traffic which passed over it, though an expert in defendant's employ refused to testify it was in first-class condition. As regards the condition of the brakes, the testimony for defendant indicates the ratchet of the brake on the smaller

car was in place and the rod of the other brake straight; in other words, tends to prove the brakes were in good order. One of the train crew testified he had examined them two days before when the cars were set on the spur at Zadoc, and they were then in proper condition; and the same witness, or another one, swore he inspected the two cars before they were taken off the spur on the evening of the accident and found them fit to move. This witness also testified deceased himself examined the brakes to see if the cars "were all right to cut off," before they were taken from the spur. One witness swore the brakes were in good condition to set and hold the cars on the grade south of Zadoc, unless the person handling them "allowed them to get the start of him;" an expression we understand to mean the brakes would control the speed if set before the cars acquired momentum. After the two cars had been shunted on the main track on the evening in question, and had started rolling down the grade, deceased ordered one of his crew to ride them down. The brakeman refused to do this and uttered a profane exclamation indicating resentment at the order, so a bystander testified; but the brakeman denied he was ordered or refused to ride the cars. The deceased got on the smaller of the cars to accompany them to the foot of the grade, and in a few minutes disappeared from the sight of the trainmen and persons about the station. One of the crew swore he saw deceased in the act of setting the brake of the smaller car as it started. When the train went southward from the station, the crew found deceased lying on the right side of the track unconscious, and with injuries on his body, including a wound in his head which caused his death from concussion of the brain, the next day. Blood was detected on the ends of the ties for twenty feet north of where he was lying. It is contended for plaintiff her husband, because of the bad repair of the brakes, was unable to control the speed of the cars as they went

down the grade, and they ran away and he was thrown to the ground by their oscillating movement as they ran rapidly along the curved track. Stave bolts were found scattered here and there for a distance of a mile south of the station, and it is said they might have knocked deceased from his position on the car. He was found about a mile, or three-quarters of a mile, from the station. As the cars neared the foot of the grade they were running very rapidly; some witnesses who dwelt near the right of way and heard them, estimating their speed at forty-five or fifty miles an hour.

We are not asked to say the foregoing evidence contains no proof of negligence on the part of the railroad company with respect to its track and the brakes on the two cars, defendant's contention being the evidence fails to prove or indicate the proximate cause of the death of the deceased. It is argued the evidence touching this issue is so uncertain as to render it a mere matter of surmise or conjecture whether the deceased was thrown from the car by reason of the bad order of the track and the brakes, or jumped or fell off from some cause unconnected with the negligence charged in the petition. Unless a causal connection was shown between the negligence charged and the injury no case was made. [Harper v. Railroad, 187 Mo. 575, 86 S. W. 99.] The defective track and brakes may have had nothing to do with the casualty and the deceased may have fallen off the car through carelessness, or jumped off with suicidal intent. Those events are within the range of possible occurrences. Nevertheless the evidence sufficiently inclines to prove neither happened and that deceased was hurled off the car by its rapid and oscillating motion due to the condition of the track and brakes, as to warrant the jury to find the latter was the manner of his death. His position and behavior when last seen by the persons about the station are to be taken into account, and he was then in his usual spirits and intent on his

duty as conductor of the train; for he was seen to climb on the smaller car and work with the brake at its northeast corner just as the two cars started away.    It is unlikely he would have ceased from this work before reaching the foot of the grade; and no one can believe he threw himself from the car, unless he did so to escape the peril in which defendant's negligence had placed him; and if he did this it is no defense.    [Root v. Railway Co., 195 Mo. 348, 357, 92 S. W. 621.]    It must strike every mind on reading the facts we have recited, as highly probable he was thrown from the car while it ran away, as were the stave bolts found at intervals on the same side of the track where his body lay.    The facts in proof do not point so vaguely to the proximate cause of the casualty as to make the finding of the jury a mere guess, but fall within the requirements of the law as to the certainty of the evidence essential to establish a causal connection between alleged negligence and damage. Plaintiff was not bound to produce witnesses who had their eyes on her husband when he fell or was thrown from the car and could testify exactly how the accident happened.    It was enough for her to prove circumstances which indicated his fall might be ascribed with reasonable probability, to the causes stated in the petition.    In this state the leading case on the degree of proof exacted to show the proximate cause of the death of a person found dead, and connect his death with the negligence charged against a defendant, is Buesching v. Gas Light Co., 73 Mo. 219.    The facts therein were enough like those before us to make the decision a precedent for our guidance.    Mrs. Buesching's husband was found dead at the bottom of an open area in front of the gaslight company's building in the city of St. Louis.    No one saw him fall or knew how his death occurred; but his body lay at the foot of a stairway leading from the sidewalk to the floor of the area.    In the opinion of the Supreme Court these propositions were,

in effect, declared as law; the gas company was guilty
of negligence in leaving the area unguarded adjacent
to a sidewalk; though the circumstances were consistent
with murder, it was fairly inferable the deceased was
not murdered; there was no presumption of suicide; but
as the evidence failed to show how the deceased came to
be where he was found it was to be presumed he fell
there accidentally and a jury would be justified in find-
ing this was the mode of the accident, inasmuch as men
always have been accustomed to reason and draw con-
clusions from such facts in the ordinary affairs of life;
it is presumed in the absence of evidence to the contrary,
the deceased was in the exercise of ordinary care when
he fell and this presumption was not overthrown by
the bare fact of the accident, but the burden was on the
gaslight company to establish contributory negligence
on the part of the deceased, either by positive testimony
or circumstances; as there was no direct testimony re-
garding his conduct when he fell, it was for the jury, not
the court, to draw inferences to overthrow the presump-
tion that he had observed due care. These doctrines have
been followed ever since they were announced, and were
approved in dealing with the question of the proximate
cause of an accident to a person found dead, in the recent
decision of Goff v. Transit Co., 199 Mo. 694. In Settle
v. Railroad, 127 Mo. 336, 30 S. W. 125, it appeared the
husband of the plaintiff had been killed by a fall from
a box car while he was making a running switch. He
was seen to take a position on the side of the car, with
his feet on a metal foothold which projected below the
side and with one hand grasping a handhold. This
handhold when in proper condition stood out two or
three inches from the car, but had been mashed in at the
middle, so the space between it and the car at said point
was less than an inch, but leaving some five or six inches
unbent at either end. Settle was next seen hanging
from the hold by his hand, his feet having slipped off

the foothold on which he had been standing.    After
hanging a minute his hand gave way and he fell on the
track and the car ran over him.    The negligence assign-
ed was permitting the handhold to remain bent inward
so it could not be readily grasped by the hand, by rea-
son of which negligence it was alleged Settle lost his
hold and fell from the car.    On the appeal, counsel for
the railroad company insisted the evidence failed to show
any causal connection between the bent condition of
the handhold and Settle's death.    We regard the facts
of that case as pointing less directly to the proximate
cause of the casualty than the facts before us; for it
was possible to get a good grasp on either end of the
handhold and hence to connect its bent condition with
Settle's death, the jury had to find he had endeavored
to grasp it in the middle, had obtained an insecure grip
and in consequence could not hold on.    In discussing the
contention the Supreme Court conceded the necessity of
proving the negligence charged had led to the accident,
and further, that the evidence relied on to do this, must
not leave the conclusion open to speculation or conjec-
ture.    It was held, too, the law required no direct proof
of the causal connection, but was satisfied if facts were
shown from which such connection might be inferred.
The court then examined the evidence and held it was
adequate to justify the jury in finding Settle lost his
life in consequence of the condition of the handhold.
These cases and others which might be cited, require us
to rule the facts we have recited sufficed for a finding
that the negligence charged against defendant in respect
of the condition of its track and brakes, was the proxi-
mate cause of the death of plaintiff's husband and war-
ranted the submission of the issue to the jury.    Coun-
sel for defendant invoke cases like Trigg v. Lumber Co.,
187 Mo. 227, 86 S. W. 222, wherein plaintiffs who asked
damages for injuries which as well might have happened
from some other cause as from the acts alleged, were

denied recoveries for failure to trace the injuries to those acts. The doctrine of such cases is everywhere recognized as sound in proper limits; but it does not extend to requiring a plaintiff to furnish demonstrative proof that the dereliction of which he accuses a defendant caused the damage, and to exclude, by the same character of proof, the possibility of the damage having resulted from any other cause. [1 Shear. & Redf., Neg. (5 Ed.), secs. 57, 58; Whitney v. Clifford, 57 Wis. 156.]

2. The proposition is presented in several forms that plaintiff's case must fail because her husband assumed the risk of injury from the bad repair of the railroad and the brakes. Counsel for defendant support this position with these arguments: deceased had been working for the company on this road for ten days; defendant was conducting its business in the usual and ordinary way, as it had the right to do, and with machinery and appliances of its own selection; the opportunity of deceased to know the condition, both of the track and the brakes, was equal or superior to the opportunity of the other agents and servants of the company; further, it was his duty as manager of the train, to investigate and inspect the brakes and not take the cars out if they were in bad condition; defendant was not an insurer of deceased against accidents; it furnished certain rules relating to the inspection of tools and appliances, and refraining from the use of them if they were in a defective condition, which rules deceased disobeyed and his death was the consequence of his disobedience. Putting aside for the present the question of how far plaintiff's right to recover is affected by the failure of her husband to observe the rules of the company, we will consider the other arguments. In the Settle case the same defense was made and on much the same grounds. It was contended Settle had assumed the risk of injury from the bent handhold, as the condition of the appliance was obvious. The Supreme Court said, in effect, that

as an employee Settle had assumed the risk of all dangers incident to his employment, but the company was bound not to subject him to other hazards by failing to use ordinary care to provide secure appliances for his' use and keep them in good condition, which duty was a continuing one and any neglect of it entailed a risk the servant did not assume. As to his remaining in the company's service knowing he would have to use the handhold, the court said if this fact was allowed to defeat the action, a master would be relieved of the duty to furnish safe appliances as soon as the servant became aware the duty was violated; and that the retention of service after becoming apprised of a defective appliance was relevant only to the defense of contributory negligence. There are some cases of both earlier and later dates which lend countenance to defendant's position on this point; but the doctrine of those cases is not at present in force; for the latest decisions dealing with the defense of assumption of the risk are in accord with the Settle opinion. An employer must use ordinary care to furnish his employees a reasonably safe place to work and appliances safe to work with; and an employee by retaining the job after he becomes aware of danger in either respect, does not, as a general rule, under such circumstances as are before ·us, assume the risk of injury. He only assumes such risks as are incident to his job after his employer has fulfilled the primary duty of using care to furnish proper working places and appliances. [Blundel v. Elevator Co., 189 Mo. 552, 88 S. W. 103; Kennedy v. Railroad, 190 Mo. 424; Phippin v. Railroad, 196 Mo. 321; 93 S. W. 410; Charlton v. Railroad, 200 Mo. 413; Longree v. Mfg. Co., 120 Mo. App. 478, 97 S. W. 272; Obermeyer v. Mfg. Co., 120 Mo. App. 59, 96 S. W. 673.] In answer to the contention that defendant had the right to conduct its business in its own way and use such

instrumentalities as it chose, we point to the opinion in Curtis v. McNair, 173 Mo. 270, 283, 73 S. W. 167, where the Supreme Court held those rights of an employer are not absolute, but circumscribed by the duty the law lays on him to provide for the safety of his employees. The court below gave several instructions which presented the defense of assumption of the risk in a light very favorable to defendant. As said, no error is assigned for the refusal of instructions and those asked on this branch of the case were properly refused, because they declared, in effect, it was a defense if deceased accepted and continued in defendant's service knowing the condition of its tracks and brakes.

3. It is insisted the judgment should be reversed because the evidence shows conclusively deceased, in handling the cars in question, violated certain rules of the company intended for the security of employees and thereby brought about the accident. It is fair to presume from the evidence these rules were known to the deceased. Indeed, want of knowledge or notice of them is not asserted against their enforcement. The rules are as follows:

"The rules herein set forth govern the railroads operated by the St. Louis and San Francisco Railroad Company. They take effect February 15, 1902, superseding all previous rules and instructions inconsistent therewith. Special instructions may be issued by proper authority.

"B. F. WINCHELL,
"Vice-President and Gen. Manager.

"The service demands the faithful, intelligent and courteous discharge of duty.

"To obtain promotion, capacity must be shown for greater responsibility.

"Employees, in accepting employment, assume its risks.

"Employees whose duties are prescribed by these rules must provide themselves with a copy.

"All persons entering into or remaining in the service of this company, are warned that the business is hazardous, and that in accepting and retaining employment they must assume the ordinary risks attending it. Their attention is especially called to the fact that they are employed and retained with the express understanding and agreement that, in consideration of the compensation paid them, they will assume all risks of injury which may result to them by reason of any act, negligent or otherwise, done by any person employed by the company in the operation or maintenance of its railway, regardless of what department or line of service such person may be engaged in. (Rule 410.)

"Each employee is required to be responsible for his own safety, as well as to exercise the utmost caution to avoid injury to his fellows. Employees of every rank and grade are warned to see for themselves, before using them, that the rolling stock, machinery or tools which they are required to use, are in safe condition, or that they are put so before using. (Rule 411.)

"The company does not require or expect its employees to incur any risk, from which, by the exercise of their judgment and by personal care, they can protect themselves, but enjoins upon them and demands that they shall take time and use the means necessary to, in all cases, do their duty in safety. (Rule 412.)

"Trainmen must know that the cars in their train are in good order before starting, and inspect them whenever they have an opportunity to do so, particularly when entering or leaving sidings, or awaiting for other trains. All cars taken in their trains at intermediate stations must be examined with extra care. (Rule 286.)

"Conductors will see that the words "Bad Order"

are written with chalk on both sides of disabled cars left at stations, and defective parts marked with a cross, and report of same made to trainmaster."

In addition to the foregoing rules of the company introduced by itself, plaintiff introduced the following:

"When approaching stations, draw-bridges, railroad crossings, water or coal stations, and while descending heavy grades, conductors of all freight, mixed or work trains will require their brakemen to be out on top for one-half mile and until train comes to a full stop or has passed such point.    (Rule 278.)

"In trains fully equipped with air, front and rear brakemen should take position on high cars, dividing as nearly as possible the distance between engine and caboose, except that where there are non-air cars, one of the brakemen must take position immediately behind the rear air brake car."    (Rule 278.)

There is no evidence of whether defendant's regulations were closely or loosely followed, or of the interpretation put on them in practice.

(a)  The rules last copied were introduced by plaintiff to show deceased was in the line of his duty when he rode the cars down the grade, as they made conductors responsible for their trains, required them to protect the company's property and directed conductors of freight or mixed trains to keep a brakeman on top of a train as it descended heavy grades.    These rules are said to have made it proper for deceased to ride the cars in order to control their speed and prevent damage.    The point is made that deceased got on the car of his own volition, and a witness swore it was no part of a conductor's duty to ride cars or set brakes.    We find no difficulty in holding, independently of the rules invoked by plaintiff, the deceased was in the line of duty when he took charge of the cars.    Some member of the crew had to manage them as they ran down the grade, and it was not amiss for him to do so, if it en-

Yongue v. Railroad.

tailed no neglect of his duties as conductor. When the brakeman who was ordered to ride the cars refused, an emergency arose which compelled deceased to undertake the task himself. The point that deceased must be regarded as guilty of contributory negligence in so doing, or as having assumed a gratuitous risk, is devoid of merit, unless the risk was more than a prudent man would face.

(b)   It is contended the rules required deceased to ascertain the condition of the cars before moving them, and as he must have seen the bad repair of the brakes if he inspected them, he broke the rules by taking the cars out; whereas if he omitted to inspect, he violated the rules. This position raises a dilemma which is said to stand in the way of plaintiff's recovery on either view of the matter. All the evidence bearing on the question was introduced by defendant and goes to show deceased examined the brakes "to see they were all right." It follows he could not be held by the court to have omitted to inspect, and if an inference might be drawn from the evidence that he failed to do so, it suffices to say no hypothetical instruction was asked on the issue.

(c)   But it is said the unsafe condition of the brakes was obvious, if the witnesses for the plaintiff testified truly, and must have been observed in even a casual glance, and that this being true, knowledge of their condition ought to be imputed to deceased and hence he was guilty of an infraction of the rules in attempting to handle the cars. Several circumstances are to be considered here. It is taking much for granted to say deceased must have realized the state of the brakes. This matter will be adverted to again. It is worthy of note that the rules contain no explicit command to the conductor or train crew not to take up at a way station a car in bad order, though perhaps rules 286, 411 and 412 may be interpreted to forbid this

if the car is unsafe. Rule 286 says cars taken into trains at intermediate stations must be examined with extra care, and conductors must mark disabled cars left at stations with the words "bad order," and report the same to the trainmaster. Rule 411 warns employees of every rank to see that appliances and rolling stock are in a safe condition before using them, and protect themselves by the exercise of judgment and personal care. Rule 412 says the company does not require or expect employees to incur any risk from which they can protect themselves by judgment and care. The inquiry at this point is as to whether, viewing the conduct of deceased with reference to those rules, he must be regarded as guilty of contributory negligence, or as having assumed the risk of injury in operating the cars with the brakes as they were. Employers who conduct a complicated business, like the operation of a railroad, ought to promulgate rules for its management which will tend to protect employees, passengers and property; and, of course, if the regulations are reasonable and known to the employees, it is the duty of the latter to obey them. Speaking generally, disobedience of a rule by an employee, resulting proximately in an injury to him, constitutes contributory negligence, and a defense to his demand for damages. [20 Am. and Eng. Ency. Law (2 Ed.), 105; 26 Cyc. 1267; 1 Shear. & Redf., Neg., 207b; 3 Elliott, Railroads, sec. 1282.] Instances occur in which the breach of some simple rule was so manifestly the sole cause of a servant's injury that redress should be denied by the court; as where a brakeman, in contravention of a rule to the contrary, goes between moving cars to couple them or jumps on the front of a moving engine. [Schaub v. Railroad, 106 Mo. 74; Francis v. Railroad, 110 Mo. 287.] And plaintiffs have been nonsuited by courts where the causal connection between the breach of a rule and the injury was not so plain, including instances of a failure to in-

spect brakes before handling cars.    We cite a series of
decisions dealing with this subject: LaCroy v. Railroad,
132 N. Y. 570; Alexander v. Railroad, 83 Ky. 589; Karrer
v. Railroad, 76 Mich. 400; Railroad v. Fry, 131 Ind. 219;
Railroad v. Gruff, 132 Ind. 13; Railroad v. Pruitt, 25
Ind. App. 227; Quinn v. Railroad, 175 Mass. 150; Rail-
road v. Jewell, 46 Ill. 99; Railroad v. Eddy, 72 Ill. 138;
Railroad v. Bragonier, 119 Ill. 51; Railroad v. Barslow,
94 Ill. App. 206; Brooks v. Railroad, 47 Fed. Rep. 687.
Great injustice will result if, regardless of the circum-
stances, non-observance of rules like those invoked in
the present case, is held to preclude a recovery of dam-
ages by the servant.    In the management of enterprises
wherein many operatives are employed, and especially
in railroad operation, certain employees are intrusted
with the inspection of instrumentalities and the decis-
ion of their fitness for use.    Railway companies have
car inspectors whose duty it is to know cars are in good
order before they are sent on runs.    Railroads could
not be operated if a conductor or brakeman could sub-
stitute, at pleasure, his judgment for the regular inspec-
tor's and refuse to take a car into a train which had been
pronounced roadworthy.    Trainmen are not allowed
such a prerogative; yet companies ought to require of
conductors and crews some attention to the condition
of the cars they handle, because those in good order at
points where regular inspectors work, may get out of
order on runs or at way stations.    Therefore a minor
discretion must be left to employees who operate trains.
These practical considerations have a bearing on the ef-
fect to be given the rules in question, and this effect is
to be measured, too, by the doctrines of the law requir-
ing employers to use care to furnish reasonably safe in-
strumentalities.    The law in this State imperatively
exacts this duty and does not permit an employer to es-
cape liability for its neglect by proving an employee in-
jured by a defective instrumentality, used it knowing it

was in bad order, unless the use of it was rash. [Blundell v. Elevator Co. and other cases cited supra.] If railway companies were exonerated, *ipso facto,* from liability to employees for injuries caused by defective appliances, because of rules throwing responsibility for the condition of appliances, on the employees, the policy of our law in this regard would be defeated. How then can the doctrine that it is the primary, non-delegable duty of railway companies and other employers, to furnish safe appliances, be reconciled with the other doctrine that it is the duty and right of employers to make reasonable rules concerning the management of their affairs and the duty of employees to obey these rules? So far as we can see, only by treating the breach of such rules as an element of the defense of contributory negligence—a fact connected with said defense. So regarded, if the breach was coerced by no necessity, but was purely voluntary and obviously the proximate cause of the injury for which the culprit sues, he ought to be defeated as a matter of law. But it may be doubtful on the evidence whether the employee properly observed the rule, or under the circumstances and consistently with the exigencies of business could observe it; or doubtful whether non-observance caused the injury. In either contingency there is a case for the jury, as there is when the issue of contributory negligence arises on other classes of disputed facts. Though we find no Missouri case sufficiently like this one to serve as a precedent, we think our conclusion that the effect of the rules on the right of recovery is for the jury, is in accord with the law as laid down in standard treatises and by courts of authority. [Labatt, Master and Servant, secs. 229, 417; Railroad v. Orr, 91 Ala. 548; Railroad v. Graham, 94 Ala. 545; Railroad v. Pearson, 97 Ala. 211; O'Malley v. Railroad, 22 N. Y. Supp. 48; Myers v. Railroad, 60 N. Y. Supp. 422; Railroad v. Wood, 35 S. W. (Tex. Civ. App.) 879; Railroad v. Nicholson, 57

S. W. 693.]    Some of the cases supra (e. g., Railroad
v. Bragonier, 119 Ill.) relieved the company from lia-
bility for an accident due to defective brakes on the
ground the parties injured were specially charged to
look after the brakes.    The case of Railroad v. Kneiran,
152 Ill. 458, should be compared with those cases.    There
the duty of the employee to see that the brake was in or-
der, was secondary to the same duty entrusted to inspec-
tors, and the employee had but a poor opportunity to
detect the defect.    The Texas courts hold the question
of contributory negligence for breach of a rule by a ser-
vant, is always for the jury unless the rule violated is
a statute.    The Alabama Supreme Court said in Rail-
road v. Orr, that railroads, like other corporations, had
the right to adopt regulations for the protection of their
employees, but one which threw on an employee the
task of providing for his own safety contravened the law
itself.    If this remark refers to some Alabama statute,
the statute is not different from the law as declared by
the decisions in this State.    In the same connection
the court said it was the duty of the company to furnish
suitable appliances and in the absence of notice to the
contrary an employee had the right to presume the duty
had been performed, unless the character of the employ-
ment devolved on the servant the risk of examining ap-
pliances and seeing they were in proper condition; that
if this was his task and he neglected it, and in conse-
quence was injured, he would be guilty of contributory
negligence.    In Railroad v. Graham, the court consid-
ered a rule quite like those before us, and requiring em-
ployees, before working with cars, engines, machinery
and tools, to examine their condition for his own safety
and promptly report any defect to his superior officer
giving the right to an employee to make such examina-
tion before taking a risk, and the right to refuse to obey
an order which would expose him to danger.    That was

133 App—11

a case in which a widow sued for the death of her hus-
band alleged to have been caused by a defective draw-
head of a car, it being set up in defense the death was
caused by the deceased violating a rule of the company
requiring trainmen to examine the condition of draw-
heads before coupling cars. The court held that wheth-
er the deceased was negligent in not making an examina-
tion, or the defect was of a kind not discoverable on such
an examination as it was his duty to make, or whether
he obeyed the rule, were questions for the jury; further,
that in so far as the rule of the company required the
contrary, it was opposed to a statute of the State and
contravened the doctrine of law which required an em-
ployer to furnish safe appliances in the prosecution of
its business and hence was inoperative. A similar doc-
trine was declared in Railroad v. Pearson, 97 Ala. 211,
wherein an employee had been injured or killed by the
giving way of a defective handhold on a car. The rea-
sonable conclusion to be derived from the authorities is
that, except in obvious cases, such as where a trainman
violates a rule against coupling moving cars, a breach
by an employee of a regulation intended to secure his
safety, is a circumstance to be weighed by the jury in
passing on the defense of contributory negligence. Tak-
ing this as the law, we will apply it to the facts before
us. To our minds the contributory negligence of the
deceased is not clear enough to make it the duty of a
court to nonsuit plaintiff. We do not know that the
cars, when they were sent out from inspection points,
were in good order and no hypothetical instruction was
asked and refused on the theory that they were. They
had been loaded and deceased was notified by the sta-
tion agent to take them up and haul them to Bloomfield.
We are unwilling to say no conclusion can be drawn
from the evidence save that, by such an inspection as
deceased ought to have made at night and while stopping
at a way station, a man of ordinary prudence and skill

would have seen both brakes were out of repair and have declined to haul the cars over the short distance to Bloomfield, or that an employee of only ten days' experience on that run must have been familiar enough with the curves and grade to realize the difficulty of controlling cars on it.   One witness swore it was possible to control the speed of the two in question by holding one of the brakes wound tight.   All these facts are to be weighed in connection with the rules and, in our opinion, made the issue of the negligence of the deceased a jury matter.

There being no assignments of error because of rulings on the instructions, the foregoing disposes of the appeal and the judgment will be affirmed.   All concur.