# GETTYS, Respondent, v. ST. LOUIS TRANSIT COMPANY, Appellant.

St. Louis Court of Appeals, December 15, 1903.

1. **STREET RAILWAYS: Contributory Negligence: Active Cause of Injury.** If one deliberately and advisedly places himself in a position which makes a collision with a street car imminent, retains the position until a collision occurs, making no effort to shun it, when he might easily do so, his own carelessness is an active cause in producing the injury which results, and he cannot recover for such injuries, although the motorman in charge of the car was also negligent.

2. ———: ——— **Wantonness of Carmen.** In such case, the injured party cannot recover unless willfulness or wantonness is shown on the part of the carmen, when they might have avoided the injury.

3. ———: ———: **Vigilant Watch Ordinance: Negligence of Motorman no Excuse, When.** Where plaintiff deliberately drove upon the street car track facing an approaching car which she plainly saw, when she could have driven off and avoided the collision which followed, she cannot recover for the injuries

received although the motorman did not observe the vigilant watch ordinance, nor sound an alarm, nor stop his car when he might have done so in time to avoid the collision.

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough,* Judge.

REVERSED.

*Boyle, Priest & Lehmann,* and *Crawley, Jamison & Collet* for appellant.

(1) A plaintiff or defendant who testifies as a witness in his own behalf is conclusively bound by his deliberate admissions from the witness stand. In determining their effect, the strongest admission will be taken as true. Cogan v. Railway, 73 S. W. 738; Shirts v. Overjohn, 60 Mo. 305. Here plaintiff testifies that she stopped her horse and buggy upon defendant's track in front of and about thirty-five feet from an approaching car, and remained there passively facing the car until the collision occurred, without attempting to avert the injury for which she sues, although her horse was under perfect control. On account of these deliberate confessions of recklessness that can scarcely be paralleled the court should have taken the case from the jury and directed a verdict for defendant. Zumault v. Railroad, 74 S. W. 1015; Ledwidge v. Transit Co., 73 S. W. 1008; Cogan v. Railroad, 73 S. W. 738; Hook v. Railroad 162 Mo. 569; Tanner v. Railroad, 161 Mo. 497; Culbertson v. Railroad, 140 Mo. 33; Vogg v. Railroad, 138 Mo. 172; Huggert v. Railroad, 134 Mo. 673; Boyd v. Railroad, 105 Mo. 371; Conrad v. Railroad, 89 Mo. App. 534. (2) By the eighth subdivision of the vigilant watch ordinance offered in evidence by plaintiff it is provided: "The cars shall be entitled to the track, and any vehicle upon the track shall turn out when any car comes up, so as to leave the track unobstructed." The court having given plaintiff's first instruction upon the theory

of defendant's violation of that ordinance, the ancient doctrine of sauce for goose being sauce for gander demanded nothing less than the giving of defendant's instruction G, declaring plaintiff's duty under the same ordinance.

*A. R. Taylor* for respondent.

(1)    The evidence being all for the plaintiff and showing without dispute that the plaintiff drove her buggy upon appellant's track for the temporary purpose—first, of avoiding an obstruction in her way, and then stopping her buggy temporarily on the track when appellant's car was such a distance away as to assure her she would be able to receive the boy into the buggy and get off the track if the car paid any attention to her situation and obeyed the law, she could not be said fairly to have been negligent at all. But if she was to be considered imprudent, there she was in the plain view of the motorman.    It was daylight — she was evidently seeking to get off the track.    Yet the motorman, disregarding her situation, unmindful of his duties under the ordinance, with almost criminal neglect, runs her down without any effort to slow up or stop the car. Klockenbrinck v. Railroad, 81 Mo. App. 356-357; McAndrews v. Railroad, 83 Mo. App. 233; s. c., 88 Mo. App. 97; Reardon v. Railroad, 114 Mo. 406; Morgan v. Railroad, 159 Mo. 280; Meyers v. Railroad, 73 S. W. 381; Klockenbrinck v. Railroad, 172 Mo. 687.

GOODE, J.—This plaintiff should have been nonsuited as requested by the defendant, for the reason that all the evidence shows she was injured because of her own carelessness. One of the defendant's street cars ran into a buggy in which she was seated on September 23, 1902. The accident occurred in the daytime on Olive street between Sarah and Whittier streets in the city of St. Louis. The allegations of negligence, as stated by plaintiff's counsel in his brief, are these:

"First.  Common law negligence in running the car without using any care to watch for vehicles on defendant's tracks, and without using any care to control or stop the car, and without giving any signal by bell or otherwise, which negligent acts are alleged to have caused the collision and respondent's damages.

"Second.  The vigilant watch ordinance and its violation, which violation of said ordinance is alleged to have directly contributed to cause plaintiff's injuries."

No evidence was introduced by the defendant and but two witnesses in behalf of plaintiff, besides the physician who attended her.  She was one of those witnesses and her account of the accident is that on the day mentioned she ordered her horse and buggy from Scott & Lynch, liverymen, whose stable is on the west side of Olive street.  She took a friend out driving and after the drive was over, started to the livery stable with the horse and buggy.  She drove along Sarah to Olive street and on reaching the latter, turned west along the north side of it.  She drove on Olive street until she reached the Westminster laundry on the north side, in front of which a wagon was standing.  The wagon was close to the curb and she could have gone around it by driving with the left wheels of the buggy inside the north rail of the north track, there being two tracks on Olive street, of which the north one is used by westbound and the south one by east-bound cars.  But the livery stable where she kept her horse was diagonally across the street from the laundry and she desired to get a boy from that stable to go home with her and bring the horse and buggy back to the stable.  So, instead of driving around the wagon, she drove across the north track and stopped on the south one with the buggy standing in the track and the horse headed northwest. Her intention was to pick up the boy and then drive again to the north side of Olive street and proceed to her home.  According to her own testimony, when she drove on the south track and stopped for the boy, she

saw an east-bound car coming directly toward her and knew it would strike the buggy. The effect of her testimony on this point is disputed by her counsel, and to show what it is we will quote some excerpts, but we can not quote it all:

"Q. Which side of your buggy did the colored boy get into? A. On my left.

"Q. When your buggy stopped there for the purpose of his getting in how far away was that car? A. Well, it was farther away than from here to the door.

"Q. Well, how much farther? A. I don't know; perhaps from here to over at the corner (far corner).

"Q. How long did it take the boy to come from the stable to get into the buggy? A. Why, it didn't take him any length of time at all, because Mr. Scott saw me and sent the boy across to get into the buggy; I didn't have to go all the way across.

"Q. How far did the boy have to come to get to the buggy, to get into it? A. Well, just from the stable to that track, where my buggy was.

"Q. Of course. How far would that be Mrs. Gettys? Because we do not know? A. Well, about from here to you, where I am.

"Q. Only that far? A. Yes, sir.

"Q. Your buggy was standing in the manner in which you have described it, and the colored boy came from the stable about that distance? A. Yes, sir.

"Q. And got into your buggy. Now, what was the car doing all that time? A. Why, it was coming toward me. It didn't make any effort whatever to stop. He could have stopped; he could have avoided the accident if he had wanted to; he didn't make any effort until he crashed into the buggy and threw me out."

. . .

"Q. What did you do in order to get across? A. Well, I saw the car approaching me, and it didn't make any effort to stop, and I jerked my horse this way, so

that he would not be struck with the car even if the rest was.

"Q. You jerked your horse which way? A. North.

"Q. That would be to the right? A. Yes, sir.

"Q. You pulled him out to the right? A. Yes, sir.

"Q. When you pulled your horse that way, what occurred? A. The car ran right into my buggy.

"Q. What part of your buggy did it run into? A. The left side; the south side of it.

"Q. What portion of the buggy did it hit, the front wheels, or the hind wheels? A. It hit the front wheel and part of the dash-board, and injured both wheels.

"Q. It hit both wheels? A. Yes, sir.

"Q. When the car hit your buggy, describe to the jury what became of you? A. Why, I was thrown out."

On cross-examination she said if she had not seen the wagon in front of the laundry she would have stayed on her own side of the street, and, as Mr. Scott, the liveryman, was standing in the door of the stable, he would have sent the boy to her; but as the wagon was in the way she drove across to the south track to get the boy. She testified further as follows:

"Q. Did Mr. Scott halloo to you, or say anything to you? A. No, sir; he just nodded his head, that was all.

"Q. Bowed to you? A. Yes, sir.

"Q. Do you know why he sent the little negro over? A. Well, I suppose he saw the car coming; I don't know, I am sure; he can answer that for himself.

"Q. Did you see the car coming? A. Yes, sir.

"Q. Now were you in control of your horse? A. Yes, sir.

"Q. You had your horse under control? A. I always have had.

"Q. Well, I mean on that occasion? A. Yes, sir.

"Q. The horse was under perfect control? A. Yes, sir.

"Q. You saw the car? A. I did.

"Q. You knew where you were going? A. Yes, sir.

"Q. You were facing the car? A. Yes, sir.

"Q. And you drove over on the south track, with the horse's head in the direction that the car was coming? A. Yes, sir.

"Q. And you were looking right at the car? A. Well, I can't say that; I was looking at my horse.

"Q. Well, you saw that car at any rate? A. Yes, sir; I saw the car.

"Q. When you got over on the south track and stopped your buggy for the negro to get in, the car was about as far as from here to the corner of the room? A. Yes, sir.

"Q. Not farther than that? A. No, sir.

"Q. The conductor, or the motorman, rather, was making slow speed, you say, or rapid? A. Well, an ordinary speed.

"Q. You drove by there and stopped your horse and when you got your horse stopped for the boy to get in, the car was about as far as from here to the corner from you? A. Yes, sir.

"Q. You stood there and waited for the boy to get in? A. Yes, sir.

"Q. You saw that the motorman had not stopped the car and that it would go right into you? A. Yes, sir.

"Q. In order to save your horse, to keep your horse from being hurt, you pulled him to one side? And the car struck the wheel of the buggy? A. Yes, sir."

. . . .

"Q. When you first saw the car, after you had

stopped your horse, the car was as far as from here to the corner of the room yonder? A. Yes, sir.

Q. You waited there for that little negro to come from the stable and get in the buggy? A. Yes, sir.

"Q. And that is why you were waiting there? A. Yes, sir.

"Q. And before you could get away after the little negro got in, you saw that the car was going to strike the horse or the buggy, one, and you pulled the horse to one side? A. Yes, sir."

That testimony makes a clear case of negligence, not to say recklessness, on the part of the plaintiff; for she deliberately took a position on the track when she saw the car approaching her thirty or thirty-five feet away (the distance across the court room) and knew it would strike her. Her horse was under perfect control and she could have driven off the track easily, there being no impediment or obstruction, so far as the evidence shows, to the north, and no nearby car approaching on the north track to endanger her. She herself testified that the car that hit her was not running rapidly; only at a moderate speed, and that the motorman could have stopped it if he had tried. We have, therefore, no question of excessive speed in the case. Neither was there any testimony that the gong was not sounded by the motorman to warn her, as alleged in the petition; though, of course, no warning was necessary; for she saw the car before she drove on the track and was facing it all the time. The action is founded entirely on negligence and not on willfulness, and, hence, the contributory negligence of the plaintiff, if she was guilty of it, is a bar to her recovery. Moore v. Railroad, 75 S. W. 672; Zumalt v. Railroad, 74 S. W. 1015.

What the plaintiff relies on is that the motorman failed to obey the vigilant watch ordinance, which requires carmen to keep watch for persons and vehicles approaching a track and stop the car in the shortest time and space possible on the first appearance of danger to

such person or vehicle. This ordinance does not exonerate the plaintiff from all responsibility for her own negligence in the circumstances stated. One can not deliberately and advisedly place himself in a position which makes a collision with a street car imminent, retain the dangerous position until a collision occurs and then get damages on account of the negligence of the carmen. Moore case, supra.

We do not mean to say that even in that state of facts carmen owe no duty to the endangered person on the score of humanity, or that they may run him down; but we do mean to say that willfulness or wantonness on the part of carmen must be shown to make a case in favor of a plaintiff when the latter has so behaved. The case was not tried on the theory of willful tort, and, indeed, the car stopped simultaneously with the collision, which goes to show that the motorman, instead of disregarding plaintiff's peril when he discerned it, tried to avoid hurting her. The witness Scott, who in most respects testified like the plaintiff, differed from her as to the distance the car was from the buggy when the buggy first stopped on the track. He estimated it to have been from 150 to 200 feet, and this testimony is insisted on by plaintiff's counsel as authorizing the inference that the car could have been stopped before striking the buggy. If we take the whole of Scott's testimony, it shows even worse recklessness on the part of the plaintiff than her own does; for he testified that she not only stopped on the track, but on starting again, drove fifteen or twenty feet toward the approaching car, instead of driving off. However, suppose the car was that distance away when the buggy stopped; she was looking right at it. Did the motorman have any reason to suppose she would not drive off; and was he bound to check the car that distance away? Her buggy was light and could be quickly and easily driven out of the way. Vehicles are constantly on tracks that far ahead of cars and are as constantly turned off without injury. This case is

wholly unlike those in which plaintiffs were driving along the tracks ahead of cars but unconscious of their approach. This plaintiff did nothing to save herself, but relied on the motorman to stop the car. She was neither confused nor alarmed. Both in the Moore and Zumalt cases the doctrine was laid down that if a party is conscious of impending danger and makes no effort to shun it, when he might easily do so, his own carelessness is an active cause in producing any injury he receives and bars recovery. Passages from text writers are quoted at length in the opinion in the Moore Case; and without again quoting them we will simply refer to that authority and the citations. 7 Am. and Eng. Ency. Law (2 Ed.), 385; Cooley, Torts (2 Ed.), 812; Nellis, Street Railways, pp. 383, 384. Perhaps we had better quote the rule as stated by one of those writers, and we select Judge Cooley's text. He says:

"Regarding the case of a negligent injury, the general result of the authorities seems to be that if the plaintiff or party injured, by the exercise of ordinary care under the circumstances, might have avoided the consequences of defendant's negligence, but did not, the case is one of mutual failure, and the law will neither cast all of the consequences upon the defendant, nor will it attempt any apportionment thereof."

The judgment is reversed. *Bland, P. J.,* and *Reyburn, J.,* concur.