HAWKINS, Etc., Respondent, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

St. Louis Court of Appeals, February 9, 1909.

1. **RAILROADS: License to Use Track by Pedestrians: Duty of Railroad Company.**  Where a railroad track is used for foot travel, an engineer operating a train is bound to anticipate the presence of persons on it and to use ordinary care to see any one who might be there and to check the train when he finds a person on such track in danger of being hit.

2. ————: ————: **Prima-Facie Case.**  Where a woman walked down a railroad track which people were accustomed to use for a footpath and was met and killed by a train coming from the opposite direction, and where the evidence in an action for her death showed that the engineer did not see her until within sixty feet of her and there was no evidence tending to show that he could have seen her sooner or that he could have sounded an alarm and stopped the train before striking her after seeing her, a prima-facie case of negligence against the railroad company was not made out.

Appeal from Pemiscot Circuit Court.—*Hon. Henry C. Riley,* Judge.

REVERSED.

*W. F. Evans* and *Moses Whybark* for appellant.

(1) The deceased in this case was on the north side of the railroad track, going west, and the train which struck her was coming east, and the court erred in refusing to give the peremptory instruction at the close of all the evidence in the case as prayed for by the defendant. Kries v. Railroad, 161 Mo. 379; Skipton v. Railroad, 82 Mo. App. 134; White v. Railroad, 84 Mo. App. 411; Vogg v. Railroad, 138 Mo. 172; Jackson v. Railroad, 157 Mo. 629; Culbertson v. Railroad, 140 Mo. 35; Schmitt v. Railroad, 160 Mo. 43; Lennon v. Railroad, 198 Mo. 514; Koegals v. Railroad, 148 Mo. 321; Zimmerman v. Railroad, 71 Mo. 488; Holland v. Railroad, 210 Mo. 350; Railroad v. Wilkins, 83 C. C. A. 27, 153 Fed. 845. (2) Before the last clear chance rule can apply the negligence of the injured person must precede the negligence of the agent inflicting the injury, and he must have reasonable opportunity to avoid the accident and fail to endeavor to do so. Simms v. Railroad, 116 Mo. App. 579; Green v. Railroad, 192 Mo. 139; Moody v. Railroad, 68 Mo. 470; Yancey v. Railroad, 93 Mo. 433; Klockenbrink v. Railroad, 81 Mo. App. 351. And the rule does not apply where the negligence of the injured party is concurrent and contemporaneous, and thus directly and proximately contributing to the injury. Moore v. Railway, 176 Mo. 544; Shareman v. Transit Co., 103 Mo. App. 529. (3) It is not sufficient to show a last chance to avoid the accident, but facts must show a last clear chance, and this last clear chance must be the sole proximate cause of the injury. Bogan v. Railroad, 55 L. R. A. 418 (note 1), 129 N. C. 154. The deceased was walking facing the train and saw it and could not help but see its approach, and under the facts the defendant owed her no duty to either ring the bell or sound the whistle. Rine v. Railroad, 88 Mo. 398; Bell v. Railroad, 72 Mo. 50; Mellon v. Railroad, 99 Mo. App. 286; Karle v.

Railroad, 55 Mo. 476; Holland v. Railroad, 210 Mo. 338; Railroad v. Gravit, 26 L. R. A. 553, 93 Geo. 369; Spicer v. Railroad, 11' L. R. A. 385, 34 W. Va. 514; Toomey v. Railroad, 10 L. R. A. 139, 86 Cal. 374; Railway v. Wilkins, 83 C. C. A. 27, 153 Fed. 845.

*Reaves & Hawkins* for respondent.

STATEMENT.—Defendant's line of railway runs northwest and southeast through the town of Hayti. The depot is toward the northwest part of town and toward the southeast part another railway called the "Old Houck Line," joins defendant's line. About the same place there is a spur extending from defendant's line; so there are three railway tracks at the point. The main line runs from St. Louis to Memphis and it was on that track deceased was struck by a locomotive drawing a passenger train of several coaches. The accident occurred near the junction of the old Houck road, and at the time it occurred a train was standing on said road ready to start to Caruthersville. Some of the witnesses were passengers on that train. Deceased was sixty-four years of age, of somewhat impaired hearing, of good sight usually but wild hairs in her eyes somewhat dimmed her vision at the time of the accident. She lived in Hornersville, but had been staying with a married daughter, Mrs. Quinn, who resided in Hayti. Her intention was to leave Hayti by the very train which struck her, to visit another daughter in Gosnell, Arkansas. It was a foggy morning early in December when she started to walk from the home of Mrs. Quinn in the southeast part of Hayti along defendant's railway to the station in the northwest part of the town. The distance between the two points was from a quarter to a half mile. She was late in her departure, for the train she meant to take had already arrived and, as said, the locomotive which drew it struck her as she was walking along the track. The

track curves after passing Mrs. Quinn's house, but the degree of the curvature was not proved, further than that it was considerable. Some witnesses testified a person standing at the station, or on the crossing of the railway and a public street near the station, could see one walking in the middle of the railway at the spot where deceased was struck by the engine; but this testimony falls short of the main inquiry, which is how far the engineer in the cab of the locomotive could see deceased. The engineer testified he was watching on the right side of the engine cab, but did not observe deceased until she was within sixty feet of the engine, when he immediately blew the whistle, having kept the bell ringing continuously after leaving the station, and when within thirty feet of her, applied the emergency brakes to stop the train. He said he was unable to see her further away because, on account of the curve in the track, the front part of the locomotive hid her from his sight. Deceased was walking straight toward the locomotive, which had a brilliant headlight burning, but she either did not notice the locomotive, or made no effort to avoid it, until it was almost on her, when she whirled as if to leave the track on the south side, but was struck before she could do so. She wore a sunbonnet with ruffles in front and was looking down. There is some discrepancy in the testimony of the witnesses regarding how far she had walked along the track after leaving her daughter's. The latter's testimony goes to prove deceased entered the middle of the track as soon as she left the house, and another witness testified he saw her on the track when the train was two hundred feet from her. This witness was a passenger on the train on the Old Houck road, who happened to look backward out of the window of the coach he was in. Another witness who was on that train, testified he saw deceased only an instant before the engine hit her and when fifteen or twenty feet away. This witness gave testimony, but of rather a negative

kind, tending to prove neither the whistle nor bell of the locomotive which struck deceased was sounded. One or more witnesses testified plaintiff walked on the track for some distance after leaving her daughter's, then left it and walked on the right of way beside the track, then entered the track again to avoid a small pool of water, and as she did so stepped right in front of the locomotive. A few excerpts will be taken from the statements of the witnesses to present the most important facts they related in their own words. Mrs. Quinn said:

"Q. Where did you see her (deceased) the last time you saw her prior to that time? A. Walking on the railroad.

"Q. Where had she stayed—what time in the day was this you saw her walking on the railroad? A. It was early one morning, I don't know just what time.

"Q. Was it before sunup? A. It was just about sunrise.

"Q. Where had she stayed that night? A. Stayed at my house.

"Q. Had she left your house that morning? A. Yes, sir."

A. J. Fisher testified for plaintiff as follows:

"Q. How long was it after you saw her on the track until she was struck by the train? A. It was not but a minute—a half a minute, I don't think; of course I couldn't state exactly how many seconds.

"Q. On what part of the track was she when you first saw her? A. She was about the center of the track going down toward the depot.

"Q. You mean walking down toward the depot? A. Yes, sir.

"Q. Which way was the train going? A. Going south or southeast.

"Q. In an easterly direction? A. Yes, sir.

"Q. About how far was she from the train when you first saw her on the track? A. Well, I couldn't

say exactly about that; it must have been nearly the length—about the distance of a telegraph pole apart; it looked like in the neighborhood of it, or hardly that far.

"Q. About how far is that, estimate it? A. Well, I don't know, I couldn't say, about 150—well, it must have been two hundred or three hundred feet anyhow.

"Q. Two or three hundred feet from the engine when you saw her? A. Yes, sir, in the neighborhood of it.

"Q. You say when you saw her she was up in the middle of the track walking toward the train? A. Yes, sir.

"Q. State whether or not you kept watching her then? A. Yes, sir, watched her until I saw her turn, it looked like to the right, and the engine got in my way where I was—I was in this coach and the engine got in my way and I couldn't see her when she got off, until the engine—I saw her wheel, it looked like to jump, and I got off and went over there and looked at her.

"Q. How near was the engine to her when she started to get off the track to the right? A. I couldn't say that because the engine was in my way; I couldn't tell how many feet it was. I was back here a coach and a half and the engine shut my view off.

"Q. State whether or not the engine was right close to her? A. It must have been.

"Q. From the time you first saw her on the track until you saw her turn to the right as though to get off the track, state what she was doing all that time? A. Well, she was walking, it looked like, to make the train we were on.

"Q. State whether or not during that time she looked up? A. No, sir, I didn't see her look up at all.

"Q. Did she keep her head down all the time just like you stated awhile ago when you first saw her? A.

That is something that would be hard for me to answer right."

Thomas Gamble testified for plaintiff:

"Q. Well, tell how she was walking; describe to the jury her position, how she looked? A. It was all done so quick I couldn't tell much about her position. She was coming down the track and met this engine, and looked as though she made an effort to get off just about the time she got right up in—

"Q. Until she made an effort to get off the track, state whether or not she was looking at the train up to that time? A. Well, I don't think she was; I couldn't see.

"Q. Now you have stated she made an effort to get off the track; explain to the jury just what you saw her do? A. She just made a motion to move like she was trying to get out of the way, as though she ran upon it before she saw it.

"Q. Which way did she turn in facing the train, to her right or left to get off? A. She turned to the right.

"Q. That then threw her left side to the train—to the engine, wasn't it? A. Yes, sir, I suppose it was."

Calvin Chism for plaintiff testified:

"Q. Is the road straight or does it curve? A. It curves.

"Q. Between her (Mrs. Quinn's) house and the pecan tree? A. Between her house and the pecan tree, yes, sir.

"Q. What is the extent of the curve? A. I couldn't say; I am not very well acquainted—how long is it do you mean?

"Q. Yes, sir, is it much of a curve or just a slight curve? A. Well, it is right smart of a curve; I don't know just how much or anything about that.

"Q. Is that on the main line? A. Yes, sir."

Deceased was hit probably about forty feet from the pecan tree referred to by the witness.

Another witness said, regarding the curve:

"Q. How is the track there, straight or curved? A. It is curved.

"Q. From where Mrs. Quinn lives, does it curve to the right or to the left? A. Going toward the depot from Mrs. Quinn's it is curved to the left.

"Q. Is it a considerable curve? A. Yes, sir.

"Q. How long is that curve? A. It is probably a half a quarter; the road commences curving, I think, near Mrs. Quinn's and curves until it gets past the scene of the accident; it is gradually curved around there."

Gilbert Wallace, for defendant, testified:

"Q. Where was she when you first saw her? A. When I first saw her I had gone out on the step of the car; I was standing out on the step and it was just getting light, just a little bit twilight, and I saw her coming below the crossing.

"Q. What crossing? A. The public crossing there.

"Q. How far was that from you? A. It was not very far, probably thirty or forty yards approximately, and I saw the object; it was kind of misty or foggy a little bit, and I saw the object coming up early in the morning, and I wondered why any one should be coming along there at that time in the morning, and I saw her walking, and of course, I thought—

"Q. Never mind what you thought. Tell what you saw? A. She came up the track across on the west side of the track and came down near the car on the west side of the main line. . . .

"Q. Where was she when the train struck her? A. After she walked up the track, at first she crossed over between the S. E. track and the main line and walked along by the end of the ties, and the engine

that was pulling 805 approached her, and I was in about eight feet, it looked the best I could judge, she stepped upon the end of the ties, and just as she stepped upon the foot of the ties the pilot beam struck her in the left breast."

The engineer said:

"Q. What did you do, if anything? A. Why, as soon as I saw her with her head down I commenced blowing the whistle, and she had her head down and I still blew the whistle and shut off the steam and I saw she was not going to get out of the way further and I applied the air.

"Q. How about the bell? A. The bell was ringing from the time I left the depot; it is an air ringer.

"Q. What do you mean by an air ringer; explain so the jury can understand? A. It has a crank on there and a cylinder, and it is furnished with air from the main reservoir, and you turn a little valve in the cab and it sets your bell ringing.

"Q. It rings itself? A. Yes, sir."

People were in the habit of walking along the middle of defendant's track in going to and from the station, as well as along the right of way on either side of the track. The train was running eight or ten miles an hour, and one witness who qualified as an expert, testified it might have been stopped in forty feet if running ten miles and in twenty feet or so if running eight miles an hour. The instructions need not be recited. There is no charge that defendant's engine crew were guilty of wanton, wilful, reckless conduct or of running at excessive speed, the only assignment of negligence being this one:

"Plaintiff further states that while said Malinda Stanley was upon said track, at the place so used by pedestrians as aforesaid, at the time and in the manner aforesaid, the agents, servants and employees of the defendant in charge of said locomotive and train of cars, saw, or by the exercise of ordinary care on their

part might have seen, the said Malinda Stanley, and have become aware of the danger and imminent peril to which she was exposed while on said track, as aforesaid, in ample time to have stopped said locomotive and train of cars before they reached her, or to have given a proper alarm or warning, and thus have avoided striking and injuring her, but they negligently failed to keep a sharp and watchful lookout for persons who might then be on the track in front of said train, as it was their duty to do, and negligently caused and permitted the same to strike the said Malinda Stanley, in consequence of which she received the said injuries, which resulted in her death, as aforesaid."

GOODE, J. (after stating the facts).—According to the statements of all the eye-witnesses of the accident, the deceased walked point-blank into the locomotive, and the only discrepancy among their statements relates to the distance she was from the train when she was first seen on the track. One witness placed her as far away as one hundred and fifty feet when he first observed her and said she continued to walk, looking down, until she encountered the locomotive. As the track was used for foot travel, the engineer was bound to anticipate the presence of persons on it, and use ordinary care to see any one who might be there in time to avoid hitting him, and the same degree of care for the same purpose to check the train after he knew there was danger of a casualty. [Chamberlain v. Railway, 133 Mo. 587.] There is no proof the engineer was careless in respect of keeping a lookout. The witnesses said a person walking in the track where plaintiff was could be seen by one standing on the ground at the station. Neither this nor any other testimony tended to prove the engineer in his cab could have seen plaintiff further ahead than he testified he did. He said the front of the engine intercepted an earlier sight of her

as the train swung around the curve, and this testimony stood uncontradicted.

The next inquiry is whether there was proof he was remiss in respect of precautions to save plaintiff's life after he saw her peril. If the train was running eight miles an hour, a computation will show that only a trifle over five seconds intervened between the instant the engineer observed deceased sixty feet away, and when the locomotive struck her, and measures to save her had to be decided upon and executed in that interval. A witness said the train could have been stopped within twenty or thirty feet; a statement which looks incredible, even if taken to mean, as the witness probably intended it should be, the train could be stopped in said distance after the air brakes and other means to stop had been applied; and to apply them would consume time. The presence of deceased on the track so close to the locomotive and advancing, ought to have incited the engineer to quick action, for the situation was one of imminent peril. Granting all this, it remains that his first glimpse of her and the collision were so nearly instantaneous as to make the finding that he could have stopped the train before it reached her a conjecture, instead of a just conclusion from any fact in proof.

To our minds the testimony to prove the engineer blew the whistle after seeing deceased, is satisfactory and the converse testimony weak. Witnesses swore they did not hear the whistle after the train left the station and did hear it there. Weak and negative as such testimony must be deemed, considering the probable excitement of the witnesses in view of the impending tragedy, it must be allowed to have some tendency in support of the negligence charged, and we are confronted by the question whether we ought to affirm the judgment on the ground that the jury might find the engineer was remiss in not whistling to warn deceased after he saw her on the track, and also that if he had

whistled she would have been aroused in time to save herself. In view of the mere instant (a small fraction over five seconds) in which the engineer must have blown the whistle and deceased have moved out of the way, we think her chance to escape was too infinitesimal for a fair affirmative finding. Our Supreme Court has said a bare possibility that the accident might have been avoided will not bring into play the last chance or humane rule. [Markowitz v. Railroad, 186 Mo. 350, 359.] This ruling is pertinent both to the alleged neglect of the engineer to stop the train as soon as he could and his neglect to sound the whistle. Our experience is, that cases predicated on a breach of the rule of law requiring care to avert harm to a person whose negligence has exposed him to injury from what another is doing, perplex appellate courts more than any other. This rule of liability though eminently just, readily lends itself to abuses in findings by juries that the defendant's negligence was the sole proximate cause of an accident when there was no such negligence, or, if there was, the injured person's negligence was concurrent and fully as causative. It may be palpable on consideration of the entire evidence, that the verdict is unjust, yet discrepancies are to be found in the application of the principles of law to the facts of such cases. Adjudications on this ground of liability are very numerous and many have been cited. The results in the various cases are put on the diverse facts presented, to an extent unusual in other classes of litigation. Instead of reviewing the precedents plaintiff's counsel rely on, we will merely say none of them resembles, in its main features, the case at bar; none presents the facts of a party hurt while walking straight toward a rapidly moving locomotive bearing a brilliant headlight, continuing to walk toward it until a collision occurred, and under circumstances which prevented the engineer of the locomotive from seeing the injured person until

within sixty feet of him. The principal citations in the brief for plaintiff are the following, wherein the facts were wholly dissimilar to those before us: McNamara v. Railroad, 133 Mo. App. 145, 114 S. W. 52; Everett v. Railroad, 112 S. W. 486; Epstein v. Railroad, 197 Mo. 720; Reyborn v. Railroad, 187 Mo. 573; Fearons v. Railroad, 180 Mo. 222; Morgan v. Railroad, 159 Mo. 262; Chamberlain v. Railroad, 133 Mo. 587. This case ranges in principle under these precedents: McGrath v. Transit Co., 197 Mo. 97; Gettys v. Transit Co., 103 Mo. App. 564; Rissler v. Transit Co., 113 Mo. App. 120; Reis v. Transit Co., 179 Mo. 1; Moore v. Railway, 176 Mo. 528; Bogan v. Railroad, 129 N. C. 154.

The judgment is reversed. All concur.