## LUCY STOCKTON, Respondent, v. METROPOLITAN STREET RAILWAY CO., Appellant.

### Kansas City Court of Appeals, February 2, 1914.

NEGLIGENCE: Street Railways: Damages: Death by Wrongful Act: Jury Question. Deceased, a workman in a pit under a track in a car-barn where he had been engaged in putting shoebrakes on a car standing over the pit, had finished his work, and ordered a fellow workman to move the car and grind the brakeshoes. This is done by running the car back and forth on the track with the brakes set. The car was moved east along the track and off the pit, and then backed west over the pit catching deceased, as he was emerging from the west end of the pit, and killing him. No one saw the killing. The negligence charged was the failure to warn deceased when the car was backed. *Held*, that the case must turn upon the question whether or not there was enough evidence shown from which the jury could legally and reasonably infer that the car was negligently backed over the pit without orders or warning, and that as there was such evidence the judgment in plaintiff's favor must be affirmed.

Appeal from Jackson Circuit Court.—*Hon. James H. Slover,* Judge.

AFFIRMED.

*John H. Lucas* and *Chas. N. Sadler* for appellant.

*Henry J. Latshaw* and *Jesse E. James* for respondent.

TRIMBLE, J.—Between one and two o'clock in the afternoon of September 8, 1910, B. B. Stockton, an employee of defendant, was instantly killed by one of defendant's cars. Within six months thereafter, the plaintiff, his widow, instituted this suit under section 5425, Revised Statutes 1909, to recover damages for his death.

The tragic affair occurred in defendant's car barn at Thirty-first and Holmes streets, Kansas City, Missouri. On the floor of the barn were a number of parallel tracks running east and west upon which cars are run and stored when brought from the outside. Under one of these tracks was a "pit," or excavation, about four feet deep, forty feet long, and extending about eighteen inches beyond or outside of each rail. The rails over the pit were supported by iron posts under the rails at intervals. The pit was for the purpose of affording convenient access to the wheels, running gear and machinery of a car when it became necessary to make repairs thereon. The car stands over the pit while the work is being done.

Stockton, the deceased, and a fellow-workman named Stobaugh, had been engaged in putting new brake shoes on the car in question. A brake shoe is a curved friction-piece to press against a wheel to stop its rotation. The concave surface of the shoe must at all points fit the convex perimeter of the wheel when the brake is applied. Therefore, when new shoes are put on, it is necessary to grind them a little so they will fit the wheel properly before sending the car out on the road. This grinding is done by driving the car back and forth along the track in the car barn.

with the brakes set, thus wearing down the surface of the shoes until a perfect fit is obtained.

There was no one in the barn at the time of the accident except the two workmen and a negro boy. It was the boy's first day at the barn, he having begun that morning at seven o'clock. He was engaged in washing the windows of a car standing near and on the north side of the car on which the workmen were engaged.

When the two workmen had finished putting on the shoes it was necessary to apply the air, that is, to set the brakes in order to see that they fitted properly and had the right tension. Stockton, the deceased, thereupon called from the pit to the negro boy to get on the car and apply the air. The boy, in obedience to the command got upon the car at its east end, but said to the men that they would have to show him as he did not know how. Stobaugh then said to deceased, "One of us had better get up." Deceased said "You go up then." Stobaugh got out of the pit and got upon the east end of the car where he stood with the colored boy. Stobaugh worked the lever to show the boy how to apply and reverse the air, and the boy stood at his side watching him, intent on learning how it was done. Stobaugh then asked Stockton, the deceased, if he was ready to grind the brake shoes. Stockton in reply ordered the men to "go ahead." Thereupon Stobaugh, standing with the boy on the east end of the car, ran the car east towards the front end of the barn and then reversed it and moved the car back west again, passing over the pit and to a point about five feet west of the west end thereof, the car travelling at the rate of about four miles an hour. When Stobaugh reached the aforesaid point five feet west of the west end of the pit, both he and the boy saw deceased's cap lying on the floor between the rails and about two feet from the end of the pit. Seeing the cap, Stobaugh stopped the car. It came to a standstill with the east

end from four to ten feet west of the pit. The two got off the car and discovered deceased's dead body under the west trucks of the car.

At the west end of the pit was a ladder or steps leading from the bottom of the pit to the barn floor. On the top of the steps that led out of the pit were small particles of clothing of the same color and texture as those worn by deceased, and west of the pit, along the track between the rails, there were particles of this clothing clinging to the splinters of the boards in the floor, and the boards looked as if they had been swept by a bundle of rags having been dragged over them. Some screwdrivers, and deceased's pliers which he usually carried around with him, were lying on the step next to the floor, that is, on the first step reached after leaving the floor to descend into the pit.

Defendant demurred to the evidence both at the close of plaintiff's case in chief and also at the close of the entire case. These were overruled. The case was submitted to the jury with no instruction on the part of plaintiff except one which told the jury that, if they found for plaintiff, they might allow her such a reasonable sum, not less than $2000 nor more than $10,000, as they found and believed from the evidence, and under the instructions of the court, would be fair and reasonable. The jury found for plaintiff in the sum of $5000. Defendant appealed.

It's main contentions are that defendant's demurrer to the evidence should have been sustained; that there was a total failure to prove any of the specifications of negligence; that no negligence was shown; that the deceased was shown to have been guilty of contributory negligence; and that there was no evidence to justify the submission of the case upon the humanitarian doctrine.

The petition duly alleged the maintenance of defendant's railroad and of the car barn in connection

therewith, the location of the tracks and of the pit in said barn; that deceased was an employee; that it was his custom and duty to get into said pit to repair cars and their running gear; that while deceased was in the pit in the performance of his duties, a car was negligently run over said pit and against said Stockton whereby he was killed; and that plaintiff was his widow.

That part of the petition which sets forth the specific acts of negligence is very long, covering more than two closely printed pages of small type.

Plaintiff asked no instructions showing upon what theory of negligence the case was submitted to the jury and, therefore, we have been compelled to carefully examine the long and multitudinous specifications of negligence contained in the petition, and attempt, as best we may, to analyze and list them in order to be sure that we clearly understand what they are, and that we have overlooked none of them. Having done this, the acts of negligence specified may be listed as follows:

1. Permitting an incompetent, inexperienced, careless and reckless man to run the car.

2. Carelessly and negligently running the car over the pit when deceased was in the pit, when there was ample room in the barn outside of the pit for grinding the brake shoes.

3. Failing to make proper rules governing running cars over pits.

4. Failing to ring bell or warn deceased of the approach of the car.

5. Backing the car over the pit when it knew or should have known deceased was in or around the pit.

6. Failure to have man on rear or west end of the car to warn deceased of the approach of the car as it came back west over the pit.

7. Failure to keep proper lookout for deceased as the car approached and ran over said pit.

8. Humanitarian rule. That is that the man operating the car saw or by the exercise of ordinary care could have seen deceased in the pit, or on the track around the pit, in time to stop the car before striking deceased, or give timely warning and thereby allow deceased to get out of danger, but that the operator negligently failed to do so.

There was undoubtedly no evidence to support any of the first three specifications and hence they will be dismissed without discussion.

Before proceeding to discuss the remaining specifications numbered 5, 6, 7 and 8, there must be kept in mind a number of things bearing more or less upon all of them. First, that deceased was an employee and occupies a different status from that of a passenger or a stranger unacquainted with the work about to be done; second, that when shoes were put on it was necessary to grind them before sending the carriage on the road, and that this grinding was done by running the car back and forth with the brakes set, and that deceased knew this and understood the method of grinding them; third, being an employee and understanding what was to be done and the way of doing it, he would be presumed to be aware of and to look out for danger, and keep out of it, or at least not remain where he would likely get killed. The foregoing are considerations bearing on the view that defendant is not liable under the evidence. The considerations that follow bear on the view that defendant is liable. Both are mentioned to show they are not overlooked in the disposition of the case.

In support of the theory that defendant is liable, the evidence can be said to show that deceased's work in the pit was finished when the brake shoes were put on. There is no showing that he was required to remain in the pit to see when the shoes had been sufficiently ground. In fact, it tends to show, impliedly

at least, that the inspection given the shoes in the pit after they are put on is *before* the grinding commences. This appears from the fact that Stockton directed the boy to get on the car and apply the air, that is, set the brakes on the wheels so that he, to use the language of Stobaugh, "might see that the brakes had the *right tension* on them." And it was not until after this had been done and the air had been worked several times that Stockton was asked if he was ready for the grinding to begin and gave the command to "go ahead." Consequently it may be said it was not necessary or usual for the car to be run back over the pit with a workman remaining therein.

The next deduction reasonably appearing from the evidence is that the deceased was struck and thrown down by the car on its return west just as deceased was coming out of the pit at the west end and had reached the top step of the stairs or ladder at that place. This is shown by the fact that his tools were lying there and by the bits of clothing clinging to the steps and the splinters along the boards swept bare by the dragging of his body. It also appears reasonably certain that he was facing west and was therefore struck from behind and did not see the car as it came back upon him. This is shown by the fact that deceased's body was found with his breast "flat down upon the floor." Next, it must be remembered that deceased was apparently caught unawares and killed, that no one saw the killing, and that, if there is no evidence showing the contrary, he is presumed to have been in the exercise of due care for his own safety, and that he would not have allowed the car to run over him if he had reason to know that it would immediately start back over the pit or had received warning that it was about to do so.

With all of these considerations in mind we have, after much consideration, come to the conclusion that plaintiff's right to recover narrows down to, and de-

pends upon, the questions whether deceased must have known the car would start back immediately, or whether he had a right to expect that a warning of the bell would be given before the car started back, and whether or not such warning was in fact given, or whether deceased himself ordered it to come back, in which event a warning was unncessary. The disposition of the case, therefore, involves the fourth and fifth specifications of negligence above mentioned, especially the fourth namely, the alleged negligent failure to ring the bell before the car started back, and the case must turn, not upon whether that specification of negligence was unquestionably proved or not, but upon the question whether or not, under all the circumstances in evidence, there was enough shown from which the jury could reasonably and legally draw an inference that Stobaugh negligently failed to ring the bell but ran the car back without orders or warning, and that the death of deceased was caused thereby. This is so because our function is not to decide whether or not the failure to ring the bell was indisputably proved, but to say whether or not there was any substantial evidence to support a lawful and reasonable inference of the negligence above specified. The case must, as said, stand or fall on this proposition, and particularly on the fourth specification of negligence because the fifth specification is, in fact, a part of the fourth, and the sixth and seventh are merely parts of and involved in the eighth specification, namely, the humanitarian rule. We do not think the humanitarian rule can be successfully invoked because, there is no evidence showing when the deceased started to emerge from the pit, nor how close he was to the car when he got in its way so as to be struck. Consequently we cannot say that Stobaugh could have stopped the car after he saw or might have seen deceased's peril. [Markowitz v. Railway, 186 Mo. 350, l. c. 359; Hawkins v. Railroad, 135 Mo. App. 524, l. c. 535.]

Taking up then the question of the inference permissible to be drawn from the evidence in support of the fourth and fifth specifications, we see that the first inference to be reasonably drawn from the evidence is that deceased, after picking up his tools in the pit started up the steps at the west end thereof with his back to the car; the second is that as he reached the top step he was struck from behind by the car and crushed as he was dragged along the boards in the track west of the pit; that if he was in the exericse of ordinary care, the car must have come upon him unawares and sooner than he had reason to anticipate, or he would not have allowed it to catch and kill him. It is right here that the case, as stated before, narrows down to the question whether deceased knew the car would immediately start back, or whether he had a right to expect that the bell would ring before the car would start back and whether the bell was rung before the car started back, or whether deceased himself ordered it to come back and for that reason had no need of a bell to warn him that it was coming.

With reference to these, the evidence does not show affirmatively that in grinding the shoes the car, after completing the forward movement, is immediately and without delay started on its backward movement, or if it impliedly shows this by the manner and method in which the grinding is done, then the evidence certainly supports the inference that the start is not made until the bell is rung, and this necessarily carries the further inference that the deceased had a right to expect that the bell would be rung before it started back. That the evidence supports this inference is shown in the fact that Stobaugh says he rang the bell before he started the car east the first time although Stockton had then told them to go ahead, and that he rang the bell again when he started back west. So that it is clear that a bell is to be rung whenever a car is about to be moved in any direction either forward or back-

ward. This being so, deceased would naturally suppose and have a right to expect that before the car started back he would be apprised of its start by the ringing of the bell.

The case is now brought down to a still narrower point: Was the bell rung, or did the deceased order the car to come back? If the bell was rung, then deceased was warned and should have kept out of the way; and he should also have done so if he directed the car to come back, whether the bell was rung or not. The whole case therefore finally concentrates itself, and is summed up, in this inquiry: Can the jury, from all the facts and circumstances in evidence, reasonably draw the inference that the bell was not rung and that deceased did not order the car to come back, and can the jury, in the face of certain testimony, rightfully draw that inference? If so, the case must be affirmed. If not, it must be reversed outright.

In the first place the jury are not compelled to believe Stobaugh, or any other witness for that matter. They could rightfully take into consideration the fact that he was the man who ran the car and whose negligence killed the deceased if he was negligently killed. Now, Stobaugh says that he not only asked Stockton once if he was ready for him to run the car back and was told to come back, but that he asked Stockton the *second* time if he was ready for him to come back and again received an order from Stockton to come, the order being this time enforced with an oath on the part of Stockton. Stobaugh also says that, after receiving these two orders to come back, he rang the bell and started back. Now the negro boy, who was standing by the side of Stobaugh and who undoubtedly could have heard what Stobaugh heard and who did see what Stobaugh saw (because he saw deceased's cap as quickly as Stobaugh saw it), testified that *he neither heard the bell ring nor the alleged orders of Stockton to come back.* It would seem that if the bell

was rung he would have heard it, as it was directly under his feet, and if the order to come back was given he would have heard it, especially as it is said to have been repeated and emphasized with an oath. Under these circumstances cannot the jury say that the negro boy's failure to hear the bell or the orders is some evidence that the bell was not rung and that the orders were not given, and hence they are justified in rejecting Stobaugh's testimony that the bell was rung and the orders were given, especially when he is the man whose culpability, if any there was, resulted in the killing? The jury were explicitly told, in an instruction on the part of defendant, that if deceased was directing the movements of the car at the time he was killed, then the verdict must be for the defendant. The jury by its verdict found that he was not directing the car at that time, and if he was not, there is still less reason to think the bell was rung and more reason to think it was not. The evidence shows with reasonable certainty, or presents facts from which the jury may reasonably infer, that the reason he was caught unawares was because the car came back upon him without warning and before he would be required to expect it, that is, through the negligence alleged by plaintiff in the fourth specification hereinabove mentioned. Among the cases which may be cited in support of the doctrine that the evidence is sufficient, where there are no eyewitnesses, if it shows with reasonable certainty the cause which produced the death, or presents facts from which the jury may reasonably infer that the death or injury was caused in the manner alleged, are the following: Grant v. Kansas City Southern Ry., 157 S. W. 1016; Rhea v. Mo. Pac. Ry. Co., 156 S. W. 4; Buesching v. Gas Light Co., 73 Mo. 219, l. c. 233; Yongue v. Railroad, 133 Mo. App. 141, l. c. 149; Scheurer v. Rubber Co., 227 Mo. 347, l. c. 366.

But it is urged that deceased was guilty of contributory negligence in not watching and keeping on

the lookout for the car. The evidence does not show that he heedlessly *remained* in danger exercising no care at all for his safety. The inference is that deceased, as soon as he could gather his tools, was coming out of the pit. It is true in the Clancy case, 192 Mo. l. c. 658, the Supreme Court says the plaintiff in that case had no right to rely upon the motorman to sound the gong, and that it was negligent for him to *remain* in dangerous proximity to an approaching car and heedlessly take *no* precautions for his own safety. But in that case the plaintiff was bound to know that a car would inevitably come and yet, knowing this, heedlessly remained in danger. Here deceased was evidently coming out of the pit. There is no evidence to show that he heedlessly remained there. He knew that Stobaugh was aware he was in the pit and could rely in some degree on the thought that the car would not come back without warning, and that the car was not coming back at least until after a warning was given. In the Clancy case, however, it was the motorman's duty to come along with the car as he did, and the plaintiff in said case had no reason to think he would not. Under these circumstances, in order to absolve defendant, we would have to hold that the failure of deceased to keep a *constant watch* for the return of the car as he gathered his tools and started up the steps was negligence as matter of law. It was, however, a question for the jury whether deceased was guilty of negligence under the circumstances.

The above disposes of the questions of substantial merit in the case. Other points are raised but they can have no force in changing or affecting the result. The real question involved is whether there was sufficient evidence to justify the submission of the case to the jury. We think there was. It is a close case, but close cases are for the jury as well as those that are not close. The judgment is affirmed. All concur.